Associate Chief Justice Lee filed a dissenting opinion.
 

 On Certification from the Utah Court of Appeals
 

 Justice Himonas, opinion of the Court:
 

 INTRODUCTION
 

 ¶ 1 Michael Neese, a Utah prison inmate, has never been convicted of a sex offense, subjected to prison discipline for sexual misconduct, or otherwise adjudicated a sexual offender. Yet the Board of Pardons and Parole (Parole Board) has denied him an original release date for parole largely based on its determination that he's a sex offender and his refusal to participate in sex offender treatment. Applying the principles we articulated in
 
 Labrum v. Utah State Board of Pardons
 
 ,
 
 870 P.2d 902
 
 (Utah 1993), we hold today that the district court erred in granting summary judgment to the Parole Board on the question of whether it violated Mr. Neese's due process rights under article I, section 7 of the Utah Constitution. Before the Parole Board may take the refusal of inmates in Mr. Neese's shoes to participate in sex offender treatment into consideration in deciding whether to grant them parole, it owes them (1) timely, particularized written notice that allegations they committed unconvicted sexual offenses will be decided; (2) the opportunity to call witnesses; and (3) a written decision adequately explaining its basis for determining that they're sex offenders and asking them to participate in sex offender treatment.
 

 BACKGROUND
 

 ¶ 2 After his trial on forcible sodomy ended in a mistrial, Mr. Neese pleaded guilty to two counts of obstruction of justice, one
 count of theft, and one count of burglary. Mr. Neese received a composite prison sentence of two to thirty years. Under Utah's discretionary sentencing scheme, this meant that the Parole Board was authorized to order Mr. Neese's release any time between two and thirty years from his sentence and commitment. A nonbinding "sentencing matrix" prepared for the district court estimated that Mr. Neese would likely serve forty-six months, with an anticipated release date in 2014.
 
 [1]
 

 ¶ 3 Mr. Neese's original parole hearing began on September 13, 2011. The hearing officer asked Mr. Neese about his criminal history, his record in prison, and his plans upon release. Mr. Neese only partially accepted responsibility for the offenses to which he pleaded guilty, and he minimized his prior criminal record. Mr. Neese also reported that he'd successfully participated in anger management and other prison programming, and he stated that, upon release, he intended to work in construction.
 

 ¶ 4 The hearing officer questioned Mr. Neese extensively about allegations that he'd raped his friends' daughter in 2009, while he was an overnight guest at her parents' house. The hearing officer based his questions on Mr. Neese's presentence report, police reports, a victim statement, and correspondence from the prosecuting attorneys in Mr. Neese's case, all of which stated that the seventeen-year-old daughter of one of Mr. Neese's longtime friends had told police that she had awoken to find Mr. Neese in her bed with his erect penis between the cheeks of her buttocks.
 
 [2]
 

 ¶ 5 In response to the hearing officer's questioning, Mr. Neese "denied attempting to sodomize the victim." He acknowledged that he'd entered her room while she was sleeping and that his shirt was off at the time, but he explained that he did so because he was about to go to sleep, needed a pillow and blanket, and knew that was where his host kept spare bedding. He speculated that the alleged victim-who he testified had previously been the victim of sexual abuse-had falsely accused him because she'd been "startled" by seeing him in her room with his shirt off.
 

 ¶ 6 After his first hearing, the Parole Board declined to set a release date and scheduled a rehearing. It based its decision on (1) his "[h]istory of similar offenses," (2) his "[h]istory of unsuccessful ... supervisions," (3) the fact that he'd been convicted of offenses involving "[m]ultiple incidents and/or victims," (4) the "[p]ersonal gain he reaped from the offense," (5) his "[d]enial or minimization ... of responsibility," (6) his history of "[r]epeated, numerous ... incarceration[s] or parole revocation[s]," and (7) his lack of "[o]verall rehabilitative progress and promise." The Parole Board scheduled the rehearing for Mr. Neese on February 1, 2014, and it stated that a sex offender treatment memorandum was "due to the Board of Pardons by 01/2014."
 

 ¶ 7 Mr. Neese's rehearing took place on February 13, 2014. Unlike at his first hearing, Mr. Neese accepted responsibility for the crimes of which he was convicted and didn't seek to minimize his prior criminal history other than refusing to discuss his juvenile record because he considered it "irrelevant." The hearing officer noted that Mr. Neese had been a "good inmate" who had completed numerous life skills classes, and Mr. Neese again emphasized that he intended to do construction work once he was released.
 

 ¶ 8 As at Mr. Neese's first hearing, the hearing officer again asked Mr. Neese about his alleged 2009 sex offense. Mr. Neese again denied these allegations and testified in detail-and consistent with the testimony he gave at his first parole hearing-about what had happened, why he believed he was falsely accused, and why he thought his accuser was not credible. Mr. Neese stated that he
 wasn't willing to participate in sex offender treatment.
 

 ¶ 9 At the end of the second hearing, the hearing officer stated that he didn't "buy [Mr. Neese's] story on the sex offense." He also telegraphed that Mr. Neese's refusal to participate in sex offender treatment would be, as the district court found it was, a factor in his recommendation to the Parole Board, stating, "I'm gonna take the matter under advisement as far as what I'm gonna recommend [to the Parole Board], but ... I wish you'd ... been willing to do sex offender treatment, that would have been a lot better."
 

 ¶ 10 On February 20, 2014, the Parole Board declined for a second time to fix an early release date for Mr. Neese. Among the reasons it gave was Mr. Neese's refusal to accept responsibility-a consideration that could only apply on the assumption that Mr. Neese had committed a sexual offense because Mr. Neese had accepted responsibility for his other crimes. The Parole Board scheduled a third hearing for Mr. Neese, and again ordered the Department of Corrections to prepare a sex offender treatment memorandum.
 

 ¶ 11 After he was denied a release date for a second time, Mr. Neese filed a pro se petition for a writ of extraordinary relief. His lawsuit alleged that the Parole Board's determination that he was a sex offender and its decision to condition his parole on successful completion of sex offender treatment violated his due process rights. Mr. Neese also asked the district court to appoint counsel. The district court denied Mr. Neese's request for counsel and dismissed Mr. Neese's complaint as frivolous, but the court of appeals reversed after concluding that Mr. Neese had raised a nonfrivolous issue implicating "the fairness of the process by which the [Parole] Board undertakes its sentencing function."
 
 Neese v. Utah Bd. of Pardons & Parole
 
 , No. 2014647-CA (unpublished order Nov. 20, 2014) (quoting
 
 Padilla v. Utah Bd. of Pardons & Parole
 
 ,
 
 947 P.2d 664
 
 , 667 (Utah 1997) ).
 

 ¶ 12 On remand, the Parole Board moved for summary judgment and Mr. Neese filed a response in opposition. The district court granted summary judgment for the Parole Board, concluding that Mr. Neese received due process under the state constitution.
 

 ¶ 13 Mr. Neese now appeals. He argues that the Parole Board's determinations violate (1) the Utah Constitution's unnecessary rigor provision, (2) the Utah Constitution's due process provision, (3) the Eighth Amendment's prohibition on cruel and unusual punishment, and (4) the Fourteenth Amendment's Due Process Clause.
 

 ¶ 14 Utah Code section 78A-3-102(3)(b) gives us jurisdiction.
 

 PRESERVATION
 

 ¶ 15 Because this case poses significant preservation problems, we first address which of Mr. Neese's claims are preserved for review.
 

 ¶ 16 The preservation requirement is a "self-imposed" rule of "prudence" that aims to promote fairness and judicial economy.
 
 Fort Pierce Indus. Park Phases II, III and IV Owners Ass'n v. Shakespeare
 
 ,
 
 2016 UT 28
 
 , ¶ 13,
 
 379 P.3d 1218
 
 (citation omitted). "As a general rule, claims not raised before the trial court may not be raised on appeal."
 
 State v. Holgate
 
 ,
 
 2000 UT 74
 
 , ¶ 11,
 
 10 P.3d 346
 
 (citation omitted). To be adequately raised, a claim "must at least be raised to a level of consciousness such that the trial [court] can consider it."
 
 State v. Cruz
 
 ,
 
 2005 UT 45
 
 , ¶ 33,
 
 122 P.3d 543
 
 (alteration in original) (citation omitted). Thus, an issue is preserved when it's "presented to the trial court in such a way that the trial court has an opportunity to rule on that issue."
 
 In re Adoption of Baby E.Z.
 
 ,
 
 2011 UT 38
 
 , ¶ 25,
 
 266 P.3d 702
 
 (citation omitted) (internal quotation marks omitted). Similarly, when a lower court decides "to take up [a] question," this decision "conclusively overc[o]me[s] any objection that the issue was not preserved for appeal" because the issue has consciously been addressed by the court.
 
 Shakespeare
 
 ,
 
 2016 UT 28
 
 , ¶ 13,
 
 379 P.3d 1218
 
 (citation omitted). But the mere fact that a party "mention[ed] ... an issue without introducing supporting evidence or relevant legal authority" doesn't suffice to preserve it for appeal.
 
 Cruz
 
 ,
 
 2005 UT 45
 
 , ¶ 33,
 
 122 P.3d 543
 
 (second alteration in original) (citation omitted) (internal quotation marks omitted).
 

 ¶ 17 Two of Mr. Neese's arguments on appeal-his Eighth Amendment and unnecessary rigor challenges-are plainly unpreserved. Mr. Neese never raised an Eighth Amendment challenge to the Parole Board's actions in his petition for an extraordinary writ, and he mentioned the unnecessary rigor provision only once, without connecting it to any facts, law, or argument. Neither the Parole Board nor the district court considered these claims, nor did the court of appeals otherwise put these claims at issue in its order vacating the district court's determination that Mr. Neese's petition was frivolous and remanding to give the Parole Board an opportunity to explain why its proceedings respected Mr. Neese's due process rights. These claims are therefore not properly before us.
 
 See
 

 State v. Worwood
 
 ,
 
 2007 UT 47
 
 , ¶ 16,
 
 164 P.3d 397
 
 ("[P]erfunctorily mentioning an issue, without more, does not preserve it for appeal." (citation omitted));
 
 see also
 

 State v. Winfield
 
 ,
 
 2006 UT 4
 
 , ¶ 19,
 
 128 P.3d 1171
 
 (while pro se litigants "should be accorded every consideration that may reasonably be indulged" they're nonetheless "held to the same standard of knowledge and practice as any qualified member of the bar" (citations omitted)).
 

 ¶ 18 On the other hand, Mr. Neese's due process claims are preserved and properly before us. Mr. Neese preserved his federal due process claim in his petition for an extraordinary writ. He argued at length that the Parole Board's finding that he'd committed a sex offense of which he'd never been convicted and that its decision to factor his refusal to participate in sex offender treatment into its early release determination violated the Due Process Clause of the Fourteenth Amendment. And he adduced detailed facts and pertinent legal authority in support of this claim.
 

 ¶ 19 As the Parole Board acknowledged in its briefing to this court, Mr. Neese's state due process claim was likewise preserved before the district court. While Mr. Neese's petition didn't itself plead a separate due process claim under our constitution, the court of appeals injected the issue into the underlying proceeding when it directed the district court to solicit a response from the Parole Board on the "fairness of the process by which the [Parole] Board undertakes its sentencing function" under
 
 Padilla v. Utah Board of Pardons & Parole
 
 ,
 
 947 P.2d 664
 
 , 667 (Utah 1997) (citation omitted)-a state due process case. Based on the court of appeals' order, the Parole Board understood the issue before the district court to be "whether an inmate not convicted of a sex offense can be required to participate in sex offender treatment for purposes of determining eligibility for release on parole," and it cited
 
 Padilla
 
 in support of its argument that Mr. Neese received adequate due process protections. Similarly, the district court relied on
 
 Labrum v. Utah State Board of Pardons
 
 ,
 
 870 P.2d 902
 
 (Utah 1993) -a case solely addressing the due process protections an inmate enjoys under article I, section 7 of the Utah Constitution -in concluding that Mr. Neese had received adequate due process protections. Thus, because the Parole Board understood the state due process provision to be implicated in Mr. Neese's petition for extraordinary relief, and because the district court itself "[took] up the question," Mr. Neese's state due process claim is preserved.
 
 Shakespeare
 
 ,
 
 2016 UT 28
 
 , ¶ 13,
 
 379 P.3d 1218
 
 .
 
 [3]
 

 ¶ 20 Because Mr. Neese's due process claims are preserved for appeal, we now turn to their merits.
 

 STANDARD OF REVIEW
 

 ¶ 21 The question in this case is whether the district court erred in granting
 summary judgment in favor of the Parole Board on Mr. Neese's due process claims. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness."
 
 Salt Lake City Corp. v. Jordan River Restoration Network
 
 ,
 
 2012 UT 84
 
 , ¶ 47,
 
 299 P.3d 990
 
 (quoting
 
 Chen v. Stewart
 
 ,
 
 2004 UT 82
 
 , ¶ 25,
 
 100 P.3d 1177
 
 ). When a due process question requires "application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations."
 

 Id.
 

 (quoting
 
 Chen
 
 ,
 
 2004 UT 82
 
 , ¶ 25,
 
 100 P.3d 1177
 
 ). But on summary judgment, all factual inferences must be drawn in favor of the nonmoving party as a matter of law, and we therefore review an award of summary judgment on a due process issue only for correctness.
 
 See
 

 Rupp v. Moffo
 
 ,
 
 2015 UT 71
 
 , ¶ 5,
 
 358 P.3d 1060
 
 .
 

 ANALYSIS
 

 ¶ 22 Our court has on occasion advocated for a primacy approach under which "a state court looks first to state constitutional law, develops independent doctrine and precedent, and decides federal questions only when state law is not dispositive."
 
 State v. Worwood
 
 ,
 
 2007 UT 47
 
 , ¶ 15,
 
 164 P.3d 397
 
 (citation omitted). Here we begin with Mr. Neese's state due process claim.
 

 ¶ 23 Article I, section 7 of the Utah Constitution provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." In
 
 Labrum v. Utah State Board of Pardons
 
 , we held that this provision extends the protection of "fundamental principles of due process" to inmates at "original parole grant hearings at which predicted terms of incarceration are determined."
 
 870 P.2d 902
 
 , 911 (Utah 1993) ;
 
 see also
 

 Neel v. Holden
 
 ,
 
 886 P.2d 1097
 
 , 1101 (Utah 1994) (state due process protections apply to all parole hearings prior to and including the "hearing[ ] at which an inmate's release date is fixed"). This is because Utah has an indeterminate sentencing scheme under which the district court's role is limited to imposing the statutorily prescribed range of years for the offense of conviction. Within this range-in this case, two to thirty years-it's "left to the unfettered discretion" of the Parole Board to fix the term of imprisonment.
 
 Labrum
 
 ,
 
 870 P.2d at 908
 
 (quoting
 
 Foote v. Utah Bd. of Pardons
 
 ,
 
 808 P.2d 734
 
 , 735 (Utah 1991) ). As a consequence of this discretion, original parole grant hearings-those hearings at which the Parole Board makes "the first determination of the actual term the inmate is to serve in prison"-are in "reality ... analogous to sentencing hearings and require due process to the extent that the analogy holds."
 

 Id.
 

 ¶ 24 The hearings at issue here are original parole grant hearings directly subject to
 
 Labrum
 
 's due process protections. These protections vary depending on the demands of the particular situation.
 
 See
 

 id.
 
 at 911 ("Due process is flexible and calls for the procedural protections that the given situation demands." (quoting
 
 In re Whitesel
 
 ,
 
 111 Wash.2d 621
 
 ,
 
 763 P.2d 199
 
 , 203 (1988) (en banc))). To determine what procedural protections are due in a given case requires that we attend to the two "critical functions" of procedural due process: (1) to reduce the risk of error and (2) to "preserve the appearance of fairness and the confidence of inmates in the decisionmaking process."
 
 Id.
 
 at 909-10 (citation omitted).
 
 Labrum
 
 also instructs us to develop these procedures with an eye toward safeguarding other important criminal procedure values: "promot[ing] uniformity in sentences, reduc[ing] the need for trials by encouraging rational plea bargains, and provid[ing] incentives for good behavior in prison."
 
 Id.
 
 at 908.
 

 I. MR. NEESE WAS ENTITLED TO GREATER PROCESS THAN HE RECEIVED AT HIS ORIGINAL PAROLE GRANT HEARINGS
 

 ¶ 25 With these principles in mind, we turn to what procedural protections the Parole Board must respect before it determines that someone who has never before been adjudicated a sex offender is one and effectively conditions his early release on his participation in sex offender treatment. In
 
 Labrum
 
 , the petitioner argued that he was entitled (1) to "receive adequate notice to prepare for [his] parole release hearing" and
 (2) to "receive copies or a summary of the information in the [Parole] Board's file on which the [Parole] Board will rely."
 
 Labrum v. Utah State Bd. of Pardons
 
 ,
 
 870 P.2d 902
 
 , 904 (Utah 1993). We agreed. We explained that providing an inmate with notice of both his parole hearing and the information on which the Parole Board intended to rely in making its determination would both reduce the risk of error (by allowing the inmate to point out factual inaccuracies in his file) and promote the inmate's perception of fairness (by ensuring that his concerns were taken into account by the Parole Board).
 

 Id.
 

 at 909
 
 . And we held that these protections helped promote sentence uniformity, the rationality of plea bargains, and good behavior in prison.
 

 Id.
 

 at 908
 
 .
 

 ¶ 26
 
 Labrum
 
 didn't purport to exhaustively list the procedural protections to which the Utah Constitution entitles an inmate in an original parole hearing. Instead,
 
 Labrum
 
 "emphasize[d] ... that this opinion ... addresses only those procedures specifically requested by this petitioner."
 

 Id.
 

 at 911
 
 . It also explained that, in many cases, the only question will be whether the information before the Parole Board has basic factual inaccuracies that the inmate can correct simply by bringing them to the hearing officer's attention.
 
 See
 

 id.
 

 at 909-10
 
 (quoting
 
 Greenholtz v. Inmates of Neb. Penal & Corr. Complex
 
 ,
 
 442 U.S. 1
 
 , 33 & n.15,
 
 99 S.Ct. 2100
 
 ,
 
 60 L.Ed.2d 668
 
 (1979) (Marshall, J., dissenting)). But it left for another day "[t]he extent to which additional due process protections must be afforded inmates in this and other proceedings in the parole system," which it recognized would "require case-by-case review."
 
 Id.
 
 at 911.
 

 ¶ 27 Applying the framework that
 
 Labrum
 
 articulated, we conclude that the case before us calls for additional procedural protections, over and above notice of a hearing and the opportunity to review the information on which the Parole Board will rely in making its determination about whether, and when, to fix Mr. Neese's initial release date. The Parole Board's conduct in this case is, at a minimum, closely analogous to a sentencing court's considering uncharged or unconvicted conduct in fixing a defendant's sentence.
 
 [4]
 

 See
 

 id.
 
 at 908 (due process protections apply when Parole Board acting analogously to a sentencing court). In this case, the Parole Board has concluded that Mr. Neese committed a sexual offense of which he's never been convicted (or otherwise found liable), that Mr. Neese was unsuccessfully tried on, and culpability for which Mr. Neese specifically bargained away in plea negotiations.
 

 ¶ 28 In this circumstance-essentially turning the presumption of innocence on its head and imprisoning a person for decades for a sex crime they've never been convicted of-the two "critical functions" of procedural due process-minimizing error and promoting the perception of fairness-require greater procedural protections than thin notice and the opportunity to review the Parole Board's information.
 

 ¶ 29 Nor is simply giving the inmate an opportunity to speak on his own behalf enough to reduce the risk of error when, as here, unconvicted sexual conduct logically distinct from the offenses of conviction is at issue.
 
 See
 

 Neel v. Holden
 
 ,
 
 886 P.2d 1097
 
 , 1103 (Utah 1994) ("[T]he touchstone of due process in the context of parole hearings is whether the proposed procedural due process requirement substantially furthers the accuracy and reliability of the [Parole] Board's fact-finding process."). This case is different from those instances where the Parole Board is reviewing presumptively reliable court and disciplinary files or otherwise taking into account undisputed background facts about the inmate or his victim.
 
 Cf.
 
 id.
 

 (denying that due process provision gives an inmate the right to have counsel address the Parole Board when the inmate "failed to show how the further participation of counsel at the hearing would have affected the accuracy of the information considered by the [Parole] Board");
 
 Monson v. Carver
 
 ,
 
 928 P.2d 1017
 
 , 1030 (Utah 1996) (denying an inmate the right to call character witnesses). When the Parole Board is assessing whether an inmate has committed unconvicted
 conduct, it's sitting as a judicial fact-finder for purposes of parole adjudicating the inmate guilty of a criminal offense of which the inmate was never convicted. In both criminal trials and the closely related context of prison disciplinary proceedings, where prison authorities seek to determine whether an inmate has committed a disciplinary infraction, due process affords inmates greater procedural protections than Mr. Neese received.
 
 See
 

 Wolff v. McDonnell
 
 ,
 
 418 U.S. 539
 
 , 564, 566,
 
 94 S.Ct. 2963
 
 ,
 
 41 L.Ed.2d 935
 
 (1974) (with exceptions for prison safety, inmates have due process right "to call witnesses and present documentary evidence" in prison disciplinary proceedings because "the right to present evidence is basic to a fair hearing"; they also have a right to a detailed written rationale of the disciplinary determination);
 
 see also
 

 Rock v. Arkansas
 
 ,
 
 483 U.S. 44
 
 , 52,
 
 107 S.Ct. 2704
 
 ,
 
 97 L.Ed.2d 37
 
 (1987) (compulsory process in criminal cases).
 

 ¶ 30 Additional procedural protections are particularly important when the Parole Board is considering whether an inmate has committed an unconvicted sex offense. The determination that an inmate has committed a sex offense triggers an unusually-perhaps uniquely-harsh set of consequences. Construing the record in the light most favorable to Mr. Neese, as we must, it appears that the Parole Board places significant and perhaps determinative weight on whether an inmate deemed to be a sex offender has participated in sex offender treatment in making its early release determinations. But a prerequisite to participating in sex offender treatment is admitting to having committed a sex offense.
 
 See
 

 State v. Humphrey
 
 ,
 
 2003 UT App 333
 
 , ¶ 5,
 
 79 P.3d 960
 
 (noting that sex offender treatment programs require inmates to "admit[ ] guilt"). Thus, unlike in other situations where the Parole Board might erroneously conclude that an inmate has committed unconvicted conduct and ask that the inmate participate in additional prison programming, when the Parole Board erroneously determines that an inmate is a sex offender, that inmate
 
 can't
 
 truthfully participate in the treatment program. Unconvicted sex offenses thus pose a unique problem that requires unique procedural protections.
 

 ¶ 31 There are additional reasons why the interest in minimizing error is particularly urgent in cases where the Parole Board has determined that an inmate has committed a sex offense of which he's not been convicted, and where-as here-it's alleged that this determination has caused the Department of Corrections to classify the inmate as a sex offender. Inmates who are classified as sex offenders are beaten and raped at significantly higher rates than others in the prison population.
 
 See
 

 Renchenski v. Williams
 
 ,
 
 622 F.3d 315
 
 , 326 (3d Cir. 2010) ("[S]ex offenders are considered an anathema in the inmate subculture ... [and] inmate norms call for their savage beating." (alterations in original) (citation omitted) (internal quotation marks omitted)); Alice Ristroph,
 
 Sexual Punishments
 
 , 15 COLUM. J. GENDER & L. 139, 159-60 (2006) ("[S]ex offenders are a distinct and disfavored category within prison populations, subject to heightened abuse from both corrections officers and fellow inmates. By many reports, sex offenders are themselves disproportionately likely to be the target of sexual assault in prison." (citations omitted));
 
 see also
 
 U.S. DEP'T OF JUSTICE, NATIONAL PRISON RAPE ELIMINATION COMMISSION REPORT 75 (2009), https://perma.cc/Y762-K8U5 (noting that inmates with "prior convictions for sex offenses against an adult or child" face a heightened "risk of victimization" in prison). Additionally, sex offender treatment is highly invasive and degrading. Among other things, male participants are required to undergo penile plethysmograph tests, in which they're shown pornography while their penis is hooked to a device that measures blood flow and, hence, arousal.
 
 See
 
 UTAH ADMIN. CODE R. 251-109-6(2). According to Mr. Neese's pleadings, they're also removed from the general prison population and placed in more restrictive conditions and in closer proximity to sexual predators. These deleterious effects, when coupled with the problem that it's impossible for a person who has erroneously been classified as a sex offender to truthfully participate in sex offender treatment, make the risk of error in cases where the Parole Board decides that an inmate has committed an unconvicted sex offense particularly acute.
 

 ¶ 32 Additional procedural protections are also needed to protect the integrity of the parole-grant process and to promote the other criminal procedure values that
 
 Labrum
 
 seeks to safeguard: uniformity in sentences, rational plea bargaining, and good behavior in prison.
 
 Labrum
 
 ,
 
 870 P.2d at 908
 
 . As far as the record before us reveals, Mr. Neese has never been convicted of a sex offense or adjudicated a sex offender in a disciplinary, juvenile, or any other proceeding. While he was tried for a sex offense, the trial ended in a mistrial, and Mr. Neese subsequently entered a plea agreement only to other, nonsexual charges. In short, Mr. Neese accepted an offer to plead to nonsexual crimes after having steadfastly maintained that he was innocent of sexual misconduct, having gone to trial to hold the State to its burden of proving him guilty of a sex offense and having not been convicted. We think an inmate in this position would justly question the integrity of a system in which the Parole Board could, after all this, adjudge him a sex offender and postpone his release date for up to
 
 twenty-eight years
 
 based solely on unproven allegations and without giving the inmate the opportunity to call witnesses or affording him a meaningful explanation of its decision.
 

 ¶ 33 The risk of unjustified sentencing disparities in such a system is great. By the same token, defendants will be justifiably wary of accepting plea deals if they know that bargained-for dismissed charges, on which they have steadfastly maintained their innocence and that are not logically implicit in the factual basis of their allocution, can come roaring back at their parole hearing and result in a sentence decades longer than the sentence all parties contemplated based on the sentencing matrix at the time. And, given that the perception of fairness is important to good behavior in prison, this value will also be well-served by according inmates in Mr. Neese's shoes the procedural protections that basic fairness requires.
 
 See
 
 id.
 

 ¶ 34 The transcripts of the parole-grant hearings in this case underscore the need for additional procedural protections for inmates like Mr. Neese. In both his initial parole hearing and his rehearing in 2014, Mr. Neese testified consistently and emphatically that he wasn't a sexual offender. The transcripts of these hearings reveal that both his account of the events of the night on which he was accused of committing rape and his explanation of why the alleged victim falsely accused him have surface plausibility. We're hard pressed to see how Mr. Neese could have mounted a more effective defense while availing himself only of the basic due process protections to which
 
 Labrum
 
 entitles all inmates. Yet, without explaining why, the Parole Board chose to believe unproven allegations in a police report over Mr. Neese's explanation of why they were false. We lack confidence in the accuracy of these proceedings.
 

 ¶ 35 On appeal, the Parole Board argues that because Mr. Neese isn't entitled to parole, he can't have a "protectable liberty interest" in early release that would trigger the protections of due process over and above what
 
 Labrum
 
 already requires. The Parole Board directs our attention to federal cases holding that, in discretionary parole systems, parole boards may ask inmates to participate in sex offender treatment and even make participation a precondition to early release without according any process at all.
 

 ¶ 36 The Parole Board appears to be correct that Mr. Neese doesn't enjoy federal procedural due process protections in a discretionary parole grant hearing. Under federal law, the Due Process Clause applies only to prospective parolees who have a protected "liberty interest" in early release.
 
 Sandin v. Conner
 
 ,
 
 515 U.S. 472
 
 , 477,
 
 115 S.Ct. 2293
 
 ,
 
 132 L.Ed.2d 418
 
 (1995). But only prospective parolees who enjoy a legal entitlement or presumption in favor of early release-for example, because a statute presumptively entitles them to good-time credit-are deemed to have such a liberty interest.
 
 See
 

 Greenholtz
 
 ,
 
 442 U.S. at 7
 
 ,
 
 99 S.Ct. 2100
 
 ("The Due Process Clause applies when government action deprives a person of liberty or property ... [but t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.");
 
 see also
 

 Bd. of Pardons v. Allen
 
 ,
 
 482 U.S. 369
 
 , 373,
 
 107 S.Ct. 2415
 
 ,
 
 96 L.Ed.2d 303
 
 (1987) ("[T]he presence of a
 parole system by itself does not give rise to a constitutionally protected liberty interest in parole release."). Because discretionary parole systems don't create presumptive entitlements to early release, the federal Due Process Clause doesn't apply to require any particular process before the Parole Board (1) denies early release based, in part, on its determination that an inmate is a sex offender or even (2) makes the inmate's participation in sex offender treatment a precondition of early release.
 
 See, e.g.
 
 ,
 
 Straley v. Utah Bd. of Pardons
 
 ,
 
 582 F.3d 1208
 
 , 1214-15 (10th Cir. 2009) (Because "[t]he Utah parole statutes grant the [Parole] Board complete discretion in making parole decisions [and an inmate] has no state entitlement to parole ... [t]he Utah parole statutes ... do not create a liberty interest entitling [an inmate] to federal due process protections.");
 
 Hughes v. Owens
 
 ,
 
 320 Fed.Appx. 271
 
 , 272 (5th Cir. 2009) ("It is axiomatic that because Texas prisoners have no protected liberty interest in parole they cannot mount a challenge against any state parole review procedure on procedural (or substantive) Due Process grounds." (citation omitted) (internal quotation marks omitted));
 
 Grennier v. Frank
 
 ,
 
 453 F.3d 442
 
 , 446 (7th Cir. 2006) (holding that there is no "liberty or property interest in the prospect of parole under Wisconsin's discretionary system" and therefore no due process right to hearing before parole board may consider failure of inmate not convicted of sex offense to participate in sex offender treatment).
 

 ¶ 37 Mr. Neese has adduced no contrary authority; each of the cases that Mr. Neese cites for the proposition that the federal Due Process Clause entitles inmates to procedural protections before they may be classified as sex offenders first found a protected liberty interest based on an underlying
 
 statutory entitlement
 
 to release that the sex offender classification jeopardized.
 
 See, e.g.
 
 ,
 
 Coleman v. Dretke
 
 ,
 
 395 F.3d 216
 
 , 225 (5th Cir. 2004) (holding that parolees have protected liberty interest in not being
 
 required
 
 to participate in sex offender treatment);
 
 Gwinn v. Awmiller
 
 ,
 
 354 F.3d 1211
 
 , 1217 (10th Cir. 2004) (holding that classification as sex offender that, by operation of law, reduced rate at which inmate could earn good time credits interferes with protected liberty interest);
 
 Neal v. Shimoda
 
 ,
 
 131 F.3d 818
 
 , 829 (9th Cir. 1997) (holding that inmate's protected liberty interest is implicated when "State's regulations render the inmate
 
 completely ineligible
 
 for parole [to which the inmate is otherwise statutorily entitled] if the [sex offender] treatment program is not satisfactorily completed").
 

 ¶ 38 We acknowledge that in
 
 Sandin v. Conner
 
 , the United States Supreme Court retreated somewhat from the view that statutory and regulatory entitlements are necessary or sufficient to create protected liberty interests, and that
 
 Sandin
 
 instead urged courts to focus on the functional questions whether a parole or correctional decision has imposed an "atypical and significant hardship" on the inmate or "will inevitably affect the duration of [the] sentence."
 
 515 U.S. at 484, 487
 
 ,
 
 115 S.Ct. 2293
 
 . But federal circuit courts that have considered whether, after
 
 Sandin
 
 , inmates in discretionary sentencing schemes have any protected liberty interest in early release have uniformly concluded that they don't.
 
 See, e.g.
 
 ,
 
 Jenner v. Nikolas
 
 ,
 
 828 F.3d 713
 
 , 717 (8th Cir. 2016) (
 
 Sandin
 
 doesn't change the rule that absent a statutory right to parole there's no "protected liberty interest" for purposes of Due Process Clause);
 
 Duemmel v. Fischer
 
 ,
 
 368 Fed.Appx. 180
 
 , 182 (2d Cir. 2010) (holding that an inmate in discretionary parole system not entitled to due process before participation in sex offender treatment made a prerequisite for parole eligibility because, absent indication that inmate enjoys a "presumption of parole release," no indication that the requirement "will inevitably affect the duration of his sentence" (quoting
 
 Sandin
 
 ,
 
 515 U.S. at 487
 
 ,
 
 115 S.Ct. 2293
 
 ));
 
 Michael v. Ghee
 
 ,
 
 498 F.3d 372
 
 , 378 (6th Cir. 2007) (noting that "
 
 Sandin
 
 was decided only in the context of prison conditions, not parole eligibility" and concluding that an inmate "under a discretionary parole system" has no protected liberty interest (quoting
 
 Swihart v. Wilkinson
 
 ,
 
 209 Fed.Appx. 456
 
 , 458-59 (6th Cir. 2006) ));
 
 McQuillion v. Duncan
 
 ,
 
 306 F.3d 895
 
 , 903 (9th Cir. 2002) ("
 
 Sandin
 
 does not deal with a prisoner's liberty interest in parole and does not overrule
 
 Greenholtz
 
 and
 
 Allen
 
 ." (citing
 
 Ellis v. District of Columbia
 
 ,
 
 84 F.3d 1413
 
 , 1417-18 (D.C. Cir. 1996) ));
 
 Ellis
 
 ,
 
 84 F.3d at 1418
 
 ("Until the Court instructs us otherwise, we must follow
 
 Greenholtz
 
 and
 
 Allen
 
 because, unlike
 
 Sandin
 
 , they are directly on point. Both cases deal with a prisoner's liberty interest in parole;
 
 Sandin
 
 does not. And so we return to the language of the regulations.");
 
 Orellana v. Kyle
 
 ,
 
 65 F.3d 29
 
 , 32 (5th Cir. 1995) (
 
 Sandin
 
 doesn't change the fact that because inmates "ha[ve] no liberty interest in obtaining parole in Texas['s discretionary parole system], [they] cannot complain of the constitutionality of procedural devices attendant to parole decisions.").
 

 ¶ 39 So the Parole Board is likely right that Mr. Neese doesn't presently enjoy a federally protected liberty interest in parole. But the federal cases don't support the Parole Board's contention that
 
 Labrum
 
 sets the ceiling for state due process protections, and they're curious cases to press into that service. Instead, if the logic of these cases applied under Utah's Constitution, we'd have to overrule
 
 Labrum
 
 and hold that our constitution requires the same "liberty interest" analysis that the federal courts employ. But the Parole Board doesn't ask us to overrule
 
 Labrum
 
 , and, even more importantly, we believe that
 
 Labrum
 
 got it right: being kept in prison, potentially for decades longer than one otherwise would, is a paradigmatic example of a deprivation of liberty. Moreover, to the extent that the Parole Board asks us to conclude that
 
 Labrum
 
 is confined to its facts, we decline the invitation. The Parole Board has given us no cause to repudiate the reasoning of
 
 Labrum
 
 , and our task is to faithfully apply our precedent. We adhere to
 
 Labrum
 
 absent any argument or indication that it should be overruled.
 
 See
 

 State v. Steed
 
 ,
 
 2015 UT 76
 
 , ¶ 11 n.9,
 
 357 P.3d 547
 
 ("We should tread cautiously in overruling precedent and this is especially true where the parties have failed to brief or even argue that a particular precedent should be overruled." (citation omitted)).
 

 ¶ 40 Based on
 
 Labrum
 
 's framework and the undisputed facts (1) that Mr. Neese has never been adjudicated a sex offender in any proceeding and (2) that the Parole Board nonetheless determined that he'd committed a sex offense and thus took his refusal to participate in sex offender treatment into consideration as a factor bearing on whether he should be released, we conclude that Mr. Neese was entitled to greater due process protections than he received.
 

 II. THE ADDITIONAL PROCEDURAL PROTECTIONS TO WHICH MR. NEESE IS ENTITLED
 

 ¶ 41 Among the crucial elements of due process under article I, section 7 of the Utah Constitution are "notice to the person of the inauguration and purpose of the inquiry and the time at which such person should appear if he wishes to be heard," the "right to appear in person or by counsel," and a "fair opportunity to submit evidence."
 
 Christiansen v. Harris
 
 ,
 
 109 Utah 1
 
 ,
 
 163 P.2d 314
 
 , 317 (1945). In this case, we're, in large measure, concerned with an inmate's opportunity to submit evidence when seeking to challenge a charge that he or she has committed an entirely new sexual offense.
 

 ¶ 42 In
 
 Wolff v. McDonnell
 
 ,
 
 418 U.S. 539
 
 ,
 
 94 S.Ct. 2963
 
 ,
 
 41 L.Ed.2d 935
 
 (1974), the United States Supreme Court considered what procedures the federal Due Process Clause required prison officials to provide inmates in the closely related context of prison disciplinary proceedings. It held that inmates in disciplinary proceedings were entitled to (1) "advance written notice of the claimed violation," (2) the ability to "call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals," and (3) a "written statement of the factfinder[ ] as to the evidence relied upon and the reasons for the disciplinary action taken."
 

 Id.
 

 at 563, 566
 
 ,
 
 94 S.Ct. 2963
 
 . When a federal liberty interest is implicated, federal courts have similarly adopted these protections in proceedings where a parole board intends to classify inmates as sex offenders and require them to complete sex offender treatment as a precondition for parole eligibility.
 
 See, e.g.
 
 ,
 
 Neal v. Shimoda
 
 ,
 
 131 F.3d 818
 
 , 830 (9th Cir. 1997).
 

 ¶ 43 We hold today that the Utah Constitution requires analogous procedures in original parole grant hearings where the
 Parole Board intends to classify as a sex offender an inmate who has never been convicted of a sex offense or otherwise adjudicated a sex offender. That is, the Parole Board (1) must, in advance of the hearing, provide particularized written notice that it intends to consider and effectively decide unconvicted sexual conduct in making its parole determination; (2) unless the safe administration of the prison system requires otherwise, it must allow the inmate to call witnesses and present documentary evidence in his defense; and (3) it must provide a written statement of the evidence it relied upon and the reasons it concluded that the inmate committed the unconvicted sexual conduct.
 

 ¶ 44 These procedures will redress the due process problems that we've identified with the Parole Board's considering unconvicted sexual conduct in this case. Particularized, advance written notice and the ability to call witnesses will reduce the risk of error and promote the perception of fairness by allowing inmates to meaningfully present evidence in a situation where they've never before had the opportunity to do so. The requirement that an inmate receive particularized written notice flows directly from
 
 Labrum
 
 's holding that inmates must be given "the materials and information on which the [Parole] Board [intends to] rel[y] at an original parole grant hearing."
 
 Labrum v. Utah State Bd. of Pardons
 
 ,
 
 870 P.2d 902
 
 , 909 (Utah 1993). This right of access extends broadly to give the inmate the opportunity to review and prepare to address any information on which the Parole Board intends to rely. For example, notwithstanding the confidential nature of psychological reports, an inmate is presumptively "entitled to access psychological reports to be considered by the [Parole] Board in hearings at which the inmate's release date may be fixed or extended."
 
 Neel v. Holden
 
 ,
 
 886 P.2d 1097
 
 , 1103 (Utah 1994). Thus, when the Parole Board plans to consider unadjudicated allegations of sexual misconduct, an inmate must be given particularized written notice of the nature of those allegations sufficiently in advance of the hearing to allow him to prepare a defense.
 

 ¶ 45 An inmate who stands accused of committing an unconvicted sexual offense must also be allowed to call witnesses. To be sure, the ability to call witnesses isn't essential to the fairness and accuracy of all original parole proceedings. But when the Parole Board considers unconvicted sexual conduct, these procedural protections are "basic to a fair hearing."
 
 Wolff
 
 ,
 
 418 U.S. at 566
 
 ,
 
 94 S.Ct. 2963
 
 . This is because the Parole Board, in considering unconvicted sexual conduct, is effectively trying the inmate for an offense that has never before been adjudicated in any other forum (criminal trial, sentencing proceeding, or prison disciplinary hearing). It would be anomalous to allow the Parole Board to effectively convict an inmate of a sexual offense-effectively adding decades to his sentence and placing him in the impossible bind of having to participate in a treatment program he can't honestly engage in-without first giving the inmate the opportunity to put on testimony.
 

 ¶ 46 Similarly, a written statement of the evidence relied upon and the reasons that the Parole Board concluded that the inmate committed the unconvicted sexual conduct will promote fairness and accuracy, both by ensuring that the Parole Board has carefully considered the evidence and by creating a record of the Parole Board's adjudication that allows for meaningful due process review.
 
 Cf.
 

 Preece v. House
 
 ,
 
 886 P.2d 508
 
 , 512 (Utah 1994) (courts may review only "the
 
 process
 
 by which the [Parole] Board undertakes its sentencing function" (citation omitted) (internal quotation marks omitted)). This is particularly important when the Parole Board is, in effect, holding a miniature criminal trial-a proceeding that, more so than the ordinary functions of the Parole Board (reviewing disciplinary, court, criminal, family, and victim history and impact records and making a determination regarding early release) is squarely within the judiciary's ken. A preprinted form with aggravating and mitigating factors checked off on it
 
 presupposes
 
 that an inmate has committed a sexual offense; it doesn't explain that conclusion. And it's therefore inadequate.
 

 ¶ 47 The procedures we require today will also further other important interests. First,
 they'll eliminate the irrational disparity otherwise created by the fact that inmates in disciplinary proceedings-where the potential sanctions are often much less severe than extra years, decades, or life in prison-are entitled to
 
 Wolff
 
 's procedural protections, whereas inmates are not entitled to
 
 Wolff
 
 's procedural protections when the Parole Board is sitting in an analogous capacity by adjudicating an inmate's guilt or innocence of an offense for which he's not otherwise been found guilty.
 
 See
 

 Wolff
 
 ,
 
 418 U.S. at 563
 
 ,
 
 94 S.Ct. 2963
 
 ;
 
 Homer v. Morris
 
 ,
 
 684 P.2d 64
 
 , 67 (Utah 1984) (inmates have "due process rights in a prison disciplinary proceeding for alleged 'flagrant or serious misconduct' " (quoting
 
 Wolff
 
 ,
 
 418 U.S. at 555-56
 
 ,
 
 94 S.Ct. 2963
 
 )). Second, they'll promote rationality in sentencing by ensuring that the Parole Board has the benefit of adversarial testing in deciding whether an inmate has committed unconvicted sexual conduct.
 
 See
 

 Labrum
 
 ,
 
 870 P.2d at 908
 
 . Finally, we don't believe that these additional procedural protections are unnecessarily onerous (given that
 
 Wolff
 
 has applied these protections in disciplinary proceedings for years without needless disruption of the correctional system) and, to the extent that they reduce the Parole Board's reliance on unconvicted sexual conduct, especially conduct that has been bargained out of a plea deal, they'll safeguard the rationality of plea bargaining.
 
 See
 
 id.
 

 ¶ 48 We accordingly hold Mr. Neese was entitled to the procedural protections this opinion outlines before the Parole Board could designate him a sex offender based on previously unadjudicated allegations of sexual misconduct.
 

 III. THE DISSENT
 

 ¶ 49 The dissent believes Mr. Neese has already received more process than he's entitled to under the due process provision. According to the dissent, the framers of the Utah Constitution would have never understood the mandates of due process to extend beyond the guilt phase of a criminal proceeding. A consequence of this is that due process protections simply do not apply to sentencing-a view that, if taken seriously and to its logical conclusion, would mean that "heads you live/tails you die" sentencing doesn't offend due process in this state. And, even if the protections of due process do extend to parole proceedings, the dissent thinks Mr. Neese has received all due process requires and then some. After all, he'd been told of the parole hearing and given an opportunity to speak. He even received the packet of information on which the Parole Board relied in denying him parole.
 

 ¶ 50 We reject the dissent's analysis for two reasons. First, it can't be squared with the kind of fidelity to
 
 Labrum
 
 and its progeny that our commitment to the principles of
 
 stare decisis
 
 requires. Second, it rests exclusively on the dissent's potentially incomplete review of some sources bearing on the original meaning of article I, section 7 of the Utah Constitution.
 
 See
 

 Griffin v. United States
 
 ,
 
 502 U.S. 46
 
 , 60,
 
 112 S.Ct. 466
 
 ,
 
 116 L.Ed.2d 371
 
 (1991) (Blackmun, J., concurring in the judgment) (declining to "follow the Court on its ... tour of the common law").
 
 [5]
 

 ¶ 51 These considerations apply with particular force here because no party asked us to overrule
 
 Labrum
 
 or to confine it to its facts on the basis that it's inconsistent with the original meaning of article I, section 7 of the Utah Constitution.
 
 See
 

 Munson v. Chamberlain
 
 ,
 
 2007 UT 91
 
 , ¶ 21,
 
 173 P.3d 848
 
 (overruling the last paragraph of an opinion because it resolved a question without the "benefit [of] any adversarial briefing of the issue");
 
 see also
 

 St. Jeor v. Kerr Corp.
 
 ,
 
 2015 UT 49
 
 , ¶ 14,
 
 353 P.3d 137
 
 (" '[W]e would be ill-advised' to reach a decision regarding unsettled law 'without the benefit of adversarial briefing.' " (citation omitted)). Appellate courts have no business unsettling the law by overturning significant precedent where the parties have not asked the court to do so, nor been provided with an opportunity to brief the issue, nor (needless to say) carried their
 burden of persuasion to show us that the precedent should be overturned.
 

 ¶ 52 With this backdrop in mind, our response to the dissent proceeds in four parts. First, we explain why the dissent's approach to
 
 Labrum
 
 is inconsistent with our
 
 stare decisis
 
 principles.
 
 [6]
 
 Second, we illustrate the problem with reaching out to resolve an issue that hasn't been briefed to us by giving reasons to question the dissent's originalist analysis-its analysis of the original understanding of both the
 
 scope
 
 of due process and its
 
 content
 
 . Third, we diagnose a fundamental methodological mistake that we believe the dissent's originalist analysis commits. Finally, we close with some reflections on the relationship between originalism and policy analysis.
 

 A.
 
 Labrum
 
 and Stare Decisis
 

 ¶ 53 We've already explained why
 
 Labrum
 
 requires that Mr. Neese receive additional procedural protections-the right to particularized notice, to call witnesses, and to a fuller written explanation of the Parole Board's decision-before the Parole Board may, in effect, extend Mr. Neese's term of incarceration based on untested allegations that he committed a sex offense unrelated to the reasons for his incarceration.
 
 Supra
 
 ¶¶ 25-34. Under
 
 Labrum
 
 , "original release hearings ... are analogous to sentencing hearings and require due process to the extent that the analogy holds."
 
 Labrum v. Utah State Bd. of Pardons
 
 ,
 
 870 P.2d 902
 
 , 908 (Utah 1993) ;
 
 see also
 

 supra
 
 ¶¶ 27, 46.
 
 Labrum
 
 requires that we balance the goals of (1) minimizing errors in the Parole Board's sentencing process and (2) promoting the perception of fairness with (3) ensuring the effective administration of Utah's prison and parole systems.
 
 Labrum
 
 ,
 
 870 P.2d at
 
 909-10 ;
 
 see also
 

 supra
 
 ¶ 28.
 

 ¶ 54 In the ordinary case, the Parole Board makes its decision based on considerations such as a review of an inmate's criminal, psychological, social, and carceral history. The Parole Board examines the crimes of which the inmate has already been adjudicated, the inmate's network of social support, his disciplinary, social-programmatic, and work record in prison, and (if pertinent) uncontested therapeutic opinions of the inmate's psychologist or therapist. When this is the extent of the Parole Board's review, it need not allow an inmate to call witnesses because witnesses won't meaningfully reduce the risk of error or promote the perception of fairness. Instead, it's sufficient to give an inmate the opportunity to review the records on which the Parole Board intends to rely, to afford the inmate an opportunity to speak, and to provide a brief written summary of the factors the Parole Board considered in setting the inmate's release date.
 
 Labrum
 
 ,
 
 870 P.2d at
 
 904 ;
 
 see also
 

 Padilla v. Utah Bd. of Pardons & Parole
 
 ,
 
 947 P.2d 664
 
 , 670 (Utah 1997) (reviewing the constitutional adequacy of "rationale sheets used by the [Parole] Board to explain its parole decision"). This is because to correct errors or inaccuracies in the Parole Board's records, the inmate need only (1) have the opportunity to review those records and (2) be allowed to point them out to the Parole Board.
 
 Labrum
 
 ,
 
 870 P.2d at 909-10
 
 (focusing on the problem of "substantial inaccuracies in inmate files ... 'I have seen black men listed as white and Harvard graduates listed with borderline IQ's' ") (quoting
 
 Greenholtz v. Inmates of Neb. Penal & Corr. Complex
 
 ,
 
 442 U.S. 1
 
 , 33 & n.15,
 
 99 S.Ct. 2100
 
 ,
 
 60 L.Ed.2d 668
 
 (1979) (Marshall, J., dissenting)). The written rationale sheet, in turn, gives the inmate the opportunity to make sure the Parole Board has heeded his corrections-and it gives courts the opportunity to review arbitrary and capricious decisions to rely on inaccuracies that the inmate may have already pointed out.
 

 ¶ 55 But
 
 Labrum
 
 requires more when the Parole Board goes beyond its usual role and, instead, bases its decisions on untested allegations that an inmate has committed a sex offense. In such a situation, the Parole Board is sitting not just as a sentencing tribunal, but as a trier of fact.
 
 Cf.
 

 Labrum
 
 ,
 
 870 P.2d at 908
 
 ;
 
 see
 

 supra
 
 ¶ 29. Fairness and the minimization of error thus require more than simply giving the inmate an opportunity to speak and "point out errors" in his file.
 
 Labrum
 
 ,
 
 870 P.2d at 909
 
 (citation omitted). Particularized, advanced written notice of the alleged sex offense is crucial to allowing an inmate a fair opportunity to prepare and be heard; witnesses are crucial to determining whether a person has committed such an offense; and an explanation of the Parole Board's decision is crucial for our reviewing its criminal fact-finding.
 
 See
 

 supra
 
 ¶¶ 44-47.
 

 ¶ 56 The dissent disagrees. It acknowledges that
 
 Labrum
 
 "deserves some measure of respect as a matter of
 
 stare decisis
 
 ."
 
 Infra
 
 ¶ 125. But the dissent thinks it can square its preferred result with upholding
 
 Labrum
 
 . The dissent accuses us of beginning with "the broadest conception of our opinion in
 
 Labrum
 
 " and then extending its "premises ... to their logical extreme."
 
 Infra
 
 ¶ 125. Before we apply
 
 Labrum
 
 's theory to Mr. Neese's case, the dissent contends "we should carefully consider the basis of the court's analysis in
 
 Labrum
 
 ."
 
 Infra
 
 ¶ 125. Because the dissent finds this basis wanting, it tells us to confine
 
 Labrum
 
 to its precise facts,
 
 see
 

 infra
 
 ¶ 166 (arguing against "
 
 extend
 
 [ing] [
 
 Labrum
 
 ] further" based on the dissent's view that
 
 Labrum
 
 was wrongly decided).
 

 ¶ 57 The dissent's stated approach-confine
 
 Labrum
 
 to its facts on the grounds that
 
 Labrum
 
 was wrongly decided-doesn't respect
 
 stare decisis
 
 . It's treating it like a velvet Elvis-hiding the opinion in the attic and exhibiting it only to subject it to derision. Respect for past opinions demands more.
 
 Stare decisis
 
 is "a cornerstone of Anglo-American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication."
 
 State v. Thurman
 
 ,
 
 846 P.2d 1256
 
 , 1269 (Utah 1993) (citation omitted). A fundamental requirement of
 
 stare decisis
 
 is that we not "overrule our precedents lightly."
 
 State v. Guard
 
 ,
 
 2015 UT 96
 
 , ¶ 33,
 
 371 P.3d 1
 
 (citation omitted) (internal quotation marks omitted). We thus don't overrule our precedents unless they've proven to be unpersuasive and unworkable, create more harm than good, and haven't created reliance interests.
 
 See
 

 Eldridge v. Johndrow
 
 ,
 
 2015 UT 21
 
 , ¶ 22,
 
 345 P.3d 553
 
 ;
 
 Utah Dep't of Transp. v. Admiral Beverage Corp.
 
 ,
 
 2011 UT 62
 
 , ¶¶ 16-17,
 
 275 P.3d 208
 
 ("[W]e may overturn our precedent [when] more good than harm will come by departing from precedent" and the precedent "is simply unworkable in practice." (citation omitted) (internal quotation marks omitted));
 
 see also
 

 Helf v. Chevron U.S.A. Inc.
 
 ,
 
 2015 UT 81
 
 , ¶ 92,
 
 361 P.3d 63
 
 (Lee, A.C.J., dissenting) ("Unless and until our decisions become unworkable ... they are worthy of respect.").
 

 ¶ 58 And transparency in the decision-making process and respect for our precedent require more than a bare, technical refusal to overrule. "[L]aying just claim to be honoring
 
 stare decisis
 
 requires more than beating [precedent] to a pulp and then sending it out to the lower courts weakened, denigrated, more incomprehensible than ever, and yet somehow technically alive."
 
 Hein v. Freedom from Religion Found., Inc
 
 .,
 
 551 U.S. 587
 
 , 636,
 
 127 S.Ct. 2553
 
 ,
 
 168 L.Ed.2d 424
 
 (2007) (Scalia, J., concurring in the judgment);
 
 see also
 
 Geoffrey R. Stone,
 
 The Roberts Court, Stare Decisis, and the Future of Constitutional Law
 
 , 82 TUL. L. REV. 1533, 1534 (2008). In short, respect for
 
 stare decisis
 
 requires us to "extend a precedent to the conclusion mandated by its rationale." Richard L. Hasen,
 
 Anticipatory Overrulings, Invitations, Time Bombs, and Inadvertence: How Supreme Court Justices Move the Law
 
 , 61 EMORY L.J. 779, 780 (2012) (citation omitted).
 

 ¶ 59 The dissent doesn't even attempt to explain how
 
 Labrum
 
 's principles are consistent with denying Mr. Neese the due process protections he seeks. Instead, the dissent simply tells us to confine
 
 Labrum
 
 to its facts on the grounds that
 
 Labrum
 
 got it wrong.
 
 Infra
 
 ¶¶ 125, 166. This is not a faithful application of our precedent; rather, it is "fail[ing] to extend a precedent to the conclusion mandated by its rationale." Hasen,
 
 Anticipatory Overrulings, supra
 
 , at 780 (citation omitted). It's also not how we should do business. We're an adversarial court that ought not upend our precedents absent argument from the parties that they be overruled.
 
 See
 

 State v. Steed
 
 ,
 
 2015 UT 76
 
 , ¶ 11 n.9,
 
 357 P.3d 547
 
 (The concurrence argues "that we
 should overrule
 
 McBride
 
 . We decline to do so, however, because neither party has asked us to overrule the case nor argued that it applies in the manner that [the concurrence] suggests." (citation omitted));
 
 see also
 

 supra
 
 ¶ 39. Absent a persuasive invitation to overrule our precedents, we give them a full and fair application to the facts before us.
 

 ¶ 60 Here,
 
 Labrum
 
 's full measure commands that we extend additional procedural protections to an inmate, like Mr. Neese, whom the Parole Board seeks to adjudicate a sex offender based solely on previously unadjudicated allegations that he's committed a sexual offense.
 
 Labrum
 
 rested on the proposition that "original release hearings"-such as the hearing at issue here-"are analogous to sentencing hearings and require due process to the extent that the analogy holds."
 
 Labrum
 
 ,
 
 870 P.2d at 908
 
 . The corollary of this proposition is that this court must announce "procedural safeguards ... to ensure the accuracy and fairness of [Parole] Board decisions in original parole grant hearings."
 

 Id.
 

 at 912 ;
 
 see
 

 id.
 

 at 910
 
 ("Accuracy and fairness are essential in proceedings which impinge as directly on personal liberty as original parole grant hearings."). As we've explained, a faithful application of this framework requires providing inmates the opportunity to call witnesses and requires the Parole Board to explain its decision when it decides to consider unadjudicated allegations of sexual misconduct in setting an inmate's sentence.
 
 Supra
 
 ¶¶ 25-34.
 

 ¶ 61 The dissent would have us provide only the specific procedural protections that
 
 Labrum
 
 required-not additional protections based on application of the
 
 Labrum
 
 framework, which the dissent fairly characterizes as
 
 Labrum's
 
 "premises."
 
 Infra
 
 ¶ 125. These premises are the rationale of the decision, the engine that drives the
 
 Labrum
 
 machine. "For all intents and purposes, adoption of [Utah's] indeterminate sentencing system transformed the [Parole] Board from an agency having the ability to shorten a prisoner's judge-determined sentence into an agency with power analogous to that of a court to actually impose a sentence. Therefore," we've held, "the [Parole] Board's decision of whether to grant parole does implicate the offender's liberty interest because at the time an offender first comes before the [Parole] Board, no term of incarceration has been fixed."
 
 Neel v. Holden
 
 ,
 
 886 P.2d 1097
 
 , 1101 (Utah 1994). "[B]y acknowledging ... that the parole function is a complex, multi-dimensional proceeding
 
 which includes sentencing
 
 , we have opened the door to a more extensive review of the constitutional adequacy of procedures that the [Parole] Board, and probably the legislature, would prefer to exclude from such review."
 
 Padilla
 
 ,
 
 947 P.2d at 669
 
 (quoting
 
 Labrum
 
 ,
 
 870 P.2d at
 
 911 ).
 

 ¶ 62
 
 Labrum
 
 's rationale has thus set the terms of analysis that this court has used to analyze the due process protections to which inmates at an original parole grant hearing are entitled. Based on the analogy between original release hearings and sentencing proceedings, we've held that an inmate "is entitled to access psychological reports to be considered by the [Parole] Board in hearings at which the inmate's release date may be fixed or extended."
 
 Neel
 
 ,
 
 886 P.2d at 1103
 
 . In reaching this decision, we drew on the rationale underlying defendants' rights to information in connection with sentencing proceedings.
 
 See
 
 id.
 

 ("This rationale [drawn from sentencing decisions] guides our decision in the present case."). We also "grounded" our holding "on concerns about [ensuring] the factual accuracy of the information contained in the [Parole] Board's files."
 

 Id.
 

 at 1102
 
 (citation omitted). And we held-as we do here-that this procedural right was not unlimited: "due process does not require the disclosure of confidential information when that disclosure might lead to harm of a third person."
 

 Id.
 

 at 1103
 
 (citation omitted).
 

 ¶ 63
 
 Labrum
 
 also sets the terms of our analysis when we reject inmates' arguments for additional procedural protections. In
 
 Monson v. Carver
 
 ,
 
 928 P.2d 1017
 
 (Utah 1996), for example, while we agreed that inmates were entitled to test the accuracy of a restitution order, we held that an inmate was not allowed to call character witnesses because the inmate had not shown that the proffered testimony had "anything to do with substantially furthering the accuracy and reliability of the [Parole] Board's fact-finding
 process."
 

 Id.
 

 at 1030
 
 . We likewise refused the inmate's request for a lawyer on the grounds that he'd "failed to show how the 'participation of counsel at the hearing would have affected the accuracy of the information considered by the [Parole] Board.' "
 

 Id.
 

 (quoting
 
 Neel
 
 , 886 P.2d at 1103 ). In each case, we explained that our holding rested on the basic premise that "if an inmate fails to demonstrate how a particular procedural requirement will substantially further the [Parole] Board's fact-finding process, we have no basis for concluding that a failure to provide that procedure operated to deny the inmate due process."
 
 Id.
 
 (citation omitted).
 

 ¶ 64 If we were to follow the dissent's lead, we'd undercut the foundations of this entire line of cases. Their discrete procedural protections would remain, but there would be no coherence to those protections, and the Parole Board, the lower courts, and future litigants would be left without guidance on how to reason about our precedent in this field. Depending on the specific composition of this court, those precedents would either have new life breathed into them or they would come in for repeated, sustained criticism, until, one day, they found themselves overruled.
 

 ¶ 65 This can't be what respect for
 
 stare decisis
 
 -indeed, respect for the rule of law-allows. "If this Court is to decide cases by rule of law rather than show of hands, we must surrender to logic and choose sides ...."
 
 Hein
 
 ,
 
 551 U.S. at 618
 
 ,
 
 127 S.Ct. 2553
 
 (Scalia, J., concurring in the judgment). As nobody has asked us to overrule
 
 Labrum
 
 and its progeny, much less met the heavy burden of showing that they ought to be overruled, we must apply them fairly, according not just to their specific dispositions, but to the underlying logic they embody. This is what our opinion today does.
 

 B. The Original Meaning of Due Process
 

 ¶ 66 Our commitment to
 
 stare decisis
 
 and resolving disputes according to the adversarial process thus counsels against discarding
 
 Labrum
 
 and reaching for the original meaning of the due process provision. And, ironically, the dissent's own originalist analysis underscores the wisdom of our historiographical restraint. Without the benefit of adversarial briefing, the dissent makes two historical claims: (1) that, on its original understanding, the due process provision likely wouldn't have been understood to apply to sentencing or parole proceedings,
 
 infra
 
 ¶¶ 165-66; and (2) that, even if it did, Mr. Neese received all the process he was entitled to under the original understanding of the due process provision,
 
 infra
 
 ¶¶ 170-73.
 

 ¶ 67 We agree with the dissent that this court should look to the original meaning of the Utah Constitution when properly confronted with constitutional issues. But we don't think we should revisit our precedent without prompting from the parties and based exclusively on our own review of ratification-era common law and other historical sources. "The lack of adversarial briefing on the issues explored ... is troubling."
 
 Meza v. State
 
 ,
 
 2015 UT 70
 
 , ¶ 40,
 
 359 P.3d 592
 
 (Lee, A.C.J., concurring in part and concurring in the judgment). To show the problem with exploring these issues without the benefit of adversarial briefing, we take this opportunity to illustrate how the dissent's historiography may be incomplete.
 
 [7]
 

 1. The Original Scope of Due Process: Sentencing and Parole
 

 ¶ 68 The dissent begins by questioning whether, on the original understanding of the due process provision, due process protections would have been understood to apply to post-trial proceedings, such as sentencing proceedings and parole hearings.
 

 ¶ 69 The heart of the dissent's historical case is the supposed absence of Reconstruction and Gilded Age case law applying due process protections to discretionary sentencing proceedings. The dissent sees in this absence "an important 'dog that didn't bark' "-"[i]f the generation of the framing of the Utah Constitution viewed the constitutional
 guarantee of due process of law to attach to sentencing proceedings, surely," the dissent suggests, "someone would have raised the argument."
 
 Infra
 
 ¶ 163. And the dissent thinks it knows why due process didn't apply to these proceedings (or, later, to early parole proceedings). Any sentence less than the statutory maximum-and any decision by a parole board to release an inmate early-was "an act of grace-a grant of greater liberty than the defendant was entitled to."
 
 Infra
 
 ¶ 164 (footnote omitted).
 

 ¶ 70 We're hesitant to come to any definite conclusions about this history without the benefit of adversarial briefing. And our own independent review of the historical record illustrates why. When we examine the historical record, we don't see as clearly as the dissent a settled view that due process protections didn't apply to sentencing or parole proceedings. On this point, the dissent's historical review falls short in three respects: (a) it overlooks a body of law that appears to apply procedural protections to sentencing, (b) it overlooks plausible competing explanations for why courts didn't address sentencing due process questions more frequently than they did, and (c) its attempt to explain why due process might not have been thought to extend to sentencing proceedings-because Gilded Age penologists were in the grips of a "grace" conception of sub-maximum sentencing and parole-may be historically inaccurate.
 

 a. Examples from the body of eighteenth- and nineteenth-century cases that applied procedural protections to sentencing
 

 ¶ 71 Contrary to the dissent, it appears to us that the reports may contain notable examples of cases that applied procedural protections to sentencing proceedings.
 
 [8]
 
 For the contrary view, the dissent relies heavily on
 
 Williams v. New York
 
 ,
 
 337 U.S. 241
 
 ,
 
 69 S.Ct. 1079
 
 ,
 
 93 L.Ed. 1337
 
 (1949). Relying on
 
 Williams
 
 , the dissent tells us that "historically, 'strict evidentiary procedural limitations' governed proceedings where the 'question for consideration [was] the guilt of the defendant,' but during sentencing, a judge was not 'hedged' by procedural rules and 'could exercise a wide discretion.' "
 
 Infra
 
 ¶ 159 n.36 (alteration in original) (quoting
 
 Williams
 
 ,
 
 337 U.S. at 245-46
 
 ,
 
 69 S.Ct. 1079
 
 );
 
 see also
 

 infra
 
 ¶ 161 ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." (quoting
 
 Williams
 
 ,
 
 337 U.S. at 251
 
 ,
 
 69 S.Ct. 1079
 
 ));
 
 infra
 
 ¶ 171 n.52 ("We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination." (quoting
 
 Williams
 
 ,
 
 337 U.S. at 250
 
 ,
 
 69 S.Ct. 1079
 
 )).
 

 ¶ 72
 
 Williams
 
 , in turn, relied on
 
 State v. Reeder
 
 ,
 
 79 S.C. 139
 
 ,
 
 60 S.E. 434
 
 (1908). It appears to us, however, that
 
 Reeder
 
 and the cases on which it relied may stand for the proposition that sentencing judges must
 
 adhere
 
 to norms of due process when settling on a sentence. The issue in
 
 Reeder
 
 was whether the sentencing court should have accepted into evidence affidavits "tending greatly to aggravate the crime."
 
 60 S.E. at 435
 
 . The
 
 Reeder
 
 court held that these affidavits were admissible at sentencing. But it based this holding
 
 not
 
 on the absence of procedural protections at sentencing, but rather on its view that due process
 
 requires
 
 sentencing courts to receive a wide range of reliable information:
 

 The American cases lay down the principle that, where it devolves upon the court to determine the punishment either upon the finding or upon the plea of guilty, it is the
 
 correct practice
 
 for it to hear evidence in aggravation or mitigation, as the case may be, where there is any discretion as to the punishment. It has likewise been held that evidence of the moral character of the accused is competent to guide the court in determining the punishment to be imposed.
 

 Id.
 

 (emphasis added) (citations omitted).
 

 ¶ 73 The cases on which
 
 Reeder
 
 relies may also stand for the proposition that procedural
 protections apply at sentencing.
 
 Reeder
 
 was a follow-up case to a much earlier South Carolina case:
 
 State v. Smith
 
 ,
 
 2 S.C.L. (2 Bay) 62
 
 (S.C. Ct. Const. App. 1796). The issue in
 
 Smith
 
 was whether the defendant should have been allowed to submit mitigating evidence to the sentencing court.
 

 Id.
 

 at 62-63
 
 . The Constitutional Court of Appeals of South Carolina held that the sentencing court had erred in excluding that mitigating evidence. It held that defendants must be allowed to submit mitigating evidence "on affidavits, a reasonable time before sentence is pronounced."
 

 Id.
 

 It further elaborated substantial procedural protections for defendants at sentencing, holding that
 

 in order to guard against a failure of justice, by the non-attendance of witnesses to give testimony of such extenuating circumstances as a defendant may be desirous of submitting to the court on the sentence day ... a defendant [is] entitled to a subpoena, as a matter of right, to compel the attendance of witnesses on such occasions, as well as on trials of issues before a jury.
 

 Id.
 

 at 63
 
 . These protections bear a remarkable resemblance to those we provide Mr. Neese today.
 

 ¶ 74 The other cases on which
 
 Reeder
 
 relied likewise appear to potentially recognize the importance of procedural protections in connection with sentencing. In
 
 Kistler v. State
 
 , for example, the Supreme Court of Indiana held that the court had erred in failing to allow the defendant to "make ... proof" of mitigating evidence, as well as evidence of his good character, at trial.
 
 54 Ind. 400
 
 , 403 (1876). It based this decision on Indiana's cruel and unusual punishments clause, its proportionate punishment provision, and "the principles of natural justice and of an enlightened public policy."
 

 Id.
 

 Similarly, in
 
 People v. Vermilyea
 
 , Chief Justice Savage stated that a sentencing court must be allowed to consider "the circumstances
 
 in evidence
 
 " in meting out punishment-implying that circumstances
 
 not
 
 properly in evidence couldn't be considered.
 
 7 Cow. 108
 
 , 143 (N.Y. Sup. Ct. 1827) (emphasis added).
 
 [9]
 

 ¶ 75 So, contrary to the dissent, it appears to us that procedural protections may have been understood to apply to sentencing proceedings in the period leading up to ratification of the Utah Constitution.
 

 ¶ 76 And there are other reasons to think that the dissent may have understated the procedural protections courts devised to ensure fairness in sentencing during the eighteenth and nineteenth centuries. The eighteenth and nineteenth centuries were a time that didn't sharply distinguish between the guilt phase and the sentencing phase. As a consequence, many trial-level procedural protections may also have functioned as sentencing protections. For example, in
 
 United States v. Wynn
 
 ,
 
 11 F. 57
 
 (C.C.E.D. Mo. 1882), an appellate court reduced a defendant's sentence in light of its concern that a constitutional error had infected the
 
 guilt phase
 
 of the defendant's trial.
 

 Id.
 

 at 57-58
 
 . And an early New York Court of Appeals case-
 
 Shepherd v. People
 
 -reversed a defendant's
 
 conviction
 
 , and dismissed the criminal case against him, on the basis that his sentence was illegal.
 
 25 N.Y. 406
 
 , 406-07 (1862). And the remedy in
 
 Shepherd
 
 was "typical of the early [sentencing appeals] cases." Livingston Hall,
 
 Reduction of Criminal Sentences on Appeal: I
 
 , 37 COLUM. L. REV. 521, 525 n.17 (1937).
 

 ¶ 77 The dissent may also underestimate the degree to which jury sentencing prevailed in the nineteenth century. It appears that a comparatively small fraction of eighteenth- and nineteenth-century sentences were truly set by a judge. Thus, scholars have discovered that "[o]nly a small fraction of eighteenth-century criminal trials [at the Old Bailey] were genuinely contested inquiries into guilt or innocence" and that the great majority "were sentencing proceedings"-"[t]he main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction ...." John H. Langbein,
 
 Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources
 
 , 50 U. CHI. L. REV.1, 41 (1983). This practice also appears to have continued into the nineteenth century. "[F]rom 1800 to 1900, juries imposed sentences in noncapital cases in about half of all the states," and "[a] handful of other states permitted juries in noncapital cases to make sentencing recommendations." Morris B. Hoffman,
 
 The Case for Jury Sentencing
 
 , 52 DUKE L.J. 951, 964 (2003) (citations omitted). Moreover, "[e]ven in those states that invested trial judges with the exclusive power to sentence, their discretion ... was mostly a mirage. ... As late as 1870, state legislatures commonly set a specific period of incarceration for each offense."
 
 Id.
 
 at 964-65 (footnote omitted) (citations omitted);
 
 see also
 
 Jenia Iontcheva,
 
 Jury Sentencing as Democratic Practice
 
 , 89 VA. L. REV. 311, 319 & n.40 (2003) (noting the widespread prevalence of jury sentencing and observing that "[e]ven in jurisdictions where no direct jury sentencing existed, determinate sentencing regimes allowed jurors to influence sentencing circuitously ... by acquitting defendants of some charges, despite clear evidence of guilt"-a practice known as "pious perjury"). So, to the extent that the nineteenth century was an era of jury sentencing, the absence of appellate cases applying procedural protections to the "sentencing phase" of a criminal proceeding tells us less than we might think about whether due process protections applied at sentencing.
 
 [10]
 

 ¶ 78 And there's good reason to think due process protections may have applied at sentencing. For example, many appellate courts during the late eighteenth and nineteenth centuries insisted that defendants must be allowed to introduce evidence of their good character.
 
 See, e.g.
 
 ,
 
 Reeder
 
 ,
 
 60 S.E. at
 
 435 ;
 
 State v. Hice
 
 ,
 
 117 N.C. 782
 
 ,
 
 23 S.E. 357
 
 , 357 (1895) ("In all cases a person accused of a crime of any grade, whether a felony or a misdemeanor, has a right to offer in his defense testimony of his good character."
 

 (citations omitted));
 
 Remsen v. People
 
 ,
 
 43 N.Y. 6
 
 , 8 (1870) ("It was error to charge the jury that in any case evidence of good character would be of no avail."). While the historical record is sparse, courts appear to have been well aware that character evidence was often introduced for sentencing purposes, to allow the jury to decide whether it should exercise mercy either through jury nullification or "pious perjury" or through the direct sentencing decisions with which it was entrusted.
 
 See
 
 Michael Coenen,
 
 Of Speech and Sanctions: Toward a Penalty-Sensitive Approach to the First Amendment
 
 , 112 COLUM. L. REV. 991, 1043 n.217 (2012) ("[I]t was not uncommon for English juries-sometimes with the encouragement of their overseeing judges-to commit what Blackstone called 'pious perjury,' deliberately convicting defendants of lesser charges so as to spare them from especially harsh punishments." (citation omitted));
 
 see also
 
 Daniel D. Blinka,
 
 Character, Liberalism, and the Protean Culture of Evidence Law
 
 , 37 SEATTLE U. L. REV. 87, 123 (2013) ("[T]he character of the accused or the victim, both in the sense of disposition and reputation, was of 'fundamental importance' to juries and judges as they exercised their discretion." (citation omitted)).
 

 ¶ 79 In short, we're unconvinced of the dissent's sweeping pronouncement that due process protections didn't apply to sentencings or sentencing proceedings. Before we would be willing to reach this issue we would, at minimum, need guidance from counsel.
 

 b. Competing explanations for why courts didn't address sentencing due process questions more frequently than they did
 

 ¶ 80 Even if the dissent is right that there were comparatively few cases applying due process protections to sentencing proceedings in the eighteenth and nineteenth centuries than today, it still wouldn't be obvious to us that this "dog that didn't bark"-or barely barked-authorizes the inference that courts didn't think due process protections extended to sentencing.
 
 Infra
 
 ¶ 163. This is because it appears the dog was, at least, trebly muzzled.
 

 ¶ 81 First, there's significant authority for the proposition that appellate courts perceived their jurisdiction over criminal appeals-that is, their authority to even
 
 entertain
 
 challenges to process at trial or sentencing-to be quite limited. For most of the nineteenth century, the United States Supreme Court held that section 22 of the First Judiciary Act of 1789 barred it from exercising appellate jurisdiction over criminal cases,
 
 United States v. More
 
 , 7 U.S. (3 Cranch) 159, 172-73,
 
 2 L.Ed. 397
 
 (1805), unless a trial court certified a legal question to it under section 6 of the Act of April 29, 1802,
 
 see
 
 Briana Lynn Rosenbaum,
 
 Righting the Historical Record: A Case for Appellate Jurisdiction over Appeals of Sentences for Reasonableness Under
 
 28 U.S.C. § 1291
 

 , 62 HASTINGS L.J. 865, 880-81 (2011) ("[W]hile the Act of 1802 made review of [trial] decisions possible ... defendants 'had no right to ask for' certificat[ion] to the Supreme Court ...." (citation omitted));
 
 see also
 
 Hoffman,
 
 The Case for Jury Sentencing
 
 ,
 
 supra
 
 , at 964 ("Federal courts had virtually no role in the criminal process in the early republic, let alone a sentencing role. Federal criminal law did not begin to become a significant part of the national criminal firmament until Prohibition." (citation omitted)). Similarly, "[a]ppellate review [of criminal matters] in the states remained quite limited well into the mid-1800s. The number of cases heard by state appellate courts remained quite small into the 1900s." 7 WAYNE R. LAFAVE ET AL., CRIM. PROC. § 27.1(a) n.3 (4th ed. 2016) (citation omitted);
 
 see also
 

 Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.
 
 ,
 
 528 U.S. 152
 
 , 159,
 
 120 S.Ct. 684
 
 ,
 
 145 L.Ed.2d 597
 
 (2000) ("The States ... did not generally recognize an appeal as of right until Washington became the first to constitutionalize the right explicitly in 1889. There was similarly no right to appeal in criminal cases at common law, and appellate review of any sort was limited and rarely used." (citation omitted) (internal quotation marks omitted)).
 

 ¶ 82 This rule of non-reviewability may have been applied with special force in sentencing matters. As Professor LaFave explains, "[t]he traditional position in this country
 ... has been that 'once it is determined that a sentence is within the limits set forth in the statute under which it is imposed, appellate review is at an end.' " 6 WAYNE R. LAFAVE ET AL., CRIM. PROC. § 26.3(g) (4th ed. 2016) (citation omitted);
 
 see
 
 Notes and Comments,
 
 Appellate Review of Sentencing Procedure
 
 , 74 YALE L.J. 379, 380 (1964) ("It has long been a uniform policy of federal appellate courts not to consider a sentence within the statutory limits.");
 
 see also
 

 Gurera v. United States
 
 ,
 
 40 F.2d 338
 
 , 340-41 (8th Cir. 1930) ("If there is one rule in the federal criminal practice which is firmly established, it is that the appellate court has no control over a sentence which is within the limits allowed by a statute."). Thus, part of the explanation for any apparent dearth of case law applying procedural rights to sentencing proceedings may well be the rules and norms of criminal appellate practice-which limited review of these proceedings-as opposed to the appellate courts' considered conclusion that due process norms simply didn't apply.
 

 ¶ 83 Second, while the evidence is sparse, it appears that there may have been significantly fewer prosecutions, in the nineteenth century than today.
 
 See, e.g.
 
 , Paul J. Larkin, Jr.,
 
 Public Choice Theory and Overcriminalization
 
 , 36 HARV. J.L. & PUB. POL'Y 715, 728, 779 (2013) (noting explosive growth in the criminal justice system during the twentieth century). And, when a prosecution did arise, it was often poorly handled; the quality of the prosecution bar in nineteenth-century America was notoriously poor.
 
 See
 
 Robert M. Ireland,
 
 Privately Funded Prosecution of Crime in the Nineteenth-Century United States
 
 , 39 AM. J. LEGAL HIST. 43, 43 (1995) (noting the serious "want of talent within the office of public prosecutor"). To the extent there were fewer prosecutions and more acquittals, this too provides a competing explanation for the comparative dearth of reported appellate sentencing decisions.
 

 ¶ 84 Finally-even bracketing the norms against criminal appeals and the comparative dearth of prosecutions in the nineteenth century-the pattern of criminal appeals in the run-up to ratification appears to have been significantly different from today. The dissent thinks it obvious that, had a defendant thought he might enjoy due process rights in a sentencing proceeding, the defendant would surely have "raised" that argument on appeal.
 
 Infra
 
 ¶ 163. But, as we've explained, "there usually was only limited appellate review of criminal convictions." Thomas Y. Davies, Symposium,
 
 Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law
 
 ," 77 MISS. L.J. 1, 175 (2007). And even when they did have the opportunity to appeal, defendants didn't always have access to appellate counsel.
 
 See
 

 Douglas v. California
 
 ,
 
 372 U.S. 353
 
 ,
 
 83 S.Ct. 814
 
 ,
 
 9 L.Ed.2d 811
 
 (1963) (recognizing right to counsel on appeal for the first time);
 
 see also
 
 Benjamin H. Barton,
 
 Against Civil Gideon (and for Pro Se Court Reform)
 
 , 62 FLA. L. REV. 1227, 1265 (2010) ("[A]t the time of the passage of the Fourteenth Amendment, there was not a well-established right to appointed counsel. The mid-19th Century was, in fact, a time of court deprofessionalization where in many states there were virtually no requirements for admission to the bar and pro se practice was quite common." (citation omitted)). Moreover, even though "states began to codify existing criminal procedure standards during the mid to late nineteenth century," "criminal procedure remained primarily a judicial rather than legislative matter," which meant that "state courts were rarely called upon to assess the constitutionality of statutes that dealt with criminal procedure"-they could preserve due process through the common law. Davies,
 
 Correcting Search-and-Seizure History
 
 ,
 
 supra
 
 , at 175 (citation omitted). Additionally, the formalistic approach of many nineteenth-century courts may have made it far more likely that a criminal appeal would result in a reversal of conviction-not a sentencing review. As Professor Friedman explains:
 

 Between 1870 and 1900 there are persistent complaints that some state supreme courts behaved as if their chief function was to reverse decisions of their lower courts for technical errors .... [E]xcesses in behavior were most striking in criminal appeals. Harwell, the defendant in a Texas case decided in 1886, had been arrested and convicted for receiving stolen cattle.
 

 The Texas court reversed, because, among other things, the jury found the defendant "guity" instead of "guilty." ... The same court, however, magnanimously upheld a conviction of "guily" in 1879, proving that a "t" was less crucial than an "l" in the common law of Texas.
 

 LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 398-400 (2d ed. 1985) (citations omitted). Indeed, according to Professor Friedman, between 1875 and 1887, the Texas Court of Appeals "had reversed 1,604 criminal cases, and affirmed only 882-a margin of almost two to one."
 
 Id.
 
 at 399 ("In one volume of reports, there were five reversals to every single affirmance."). But this means that the appellate courts had far fewer occasions to redress sentencing errors-they were too busy reversing convictions!
 

 ¶ 85 In short, even to the extent the dissent is right about the lack of cases articulating procedural protections applicable to sentencing, the inference it draws from this "dog that didn't bark" ignores potential competing explanations that don't imply that the original understanding of due process didn't extend to sentencing and parole proceedings. We think it would be rash to overturn our precedent, and announce new due process standards under the Utah Constitution, based on a chain of historical inferences that may well be misleading or incomplete, and that certainly haven't been tested by the adversarial process.
 

 c. Grace
 

 ¶ 86 A key lemma in the dissent's argument for why due process didn't extend to sentencing and parole proceedings is the idea that a sentence below the statutory maximum-or a grant of parole before an indeterminate term had expired-was thought to be an act of "grace."
 
 Infra
 
 ¶ 164. If true, this theory might help explain why nineteenth-century constitutional actors lacked concern about due process protections in sentencing and parole proceedings: mercy, one might argue, isn't a liberty interest.
 

 ¶ 87 Again, however, while we're nervous to fly blind, it appears to us that the dissent may well be mistaken about the prevalence of the "grace" conception of parole. The academic literature supports the notion that parole's progenitors embraced a "medical model of criminality." Julia L. Black, Note,
 
 The Constitutionality of Federal Sentences Imposed Under the Sentencing Reform Act of 1984 after
 
 Mistretta v. United States, 75 IOWA L. REV. 767, 771 n.52 (1990) (quoting JANET SCHMIDT, DEMYSTIFYING PAROLE 4-5 (1977)). On this model, parole was not a matter of grace. Instead, parole determinations "emphasized the role of treatment in helping the criminal to understand the external forces causing his or her 'sickness,' "
 
 id.
 
 at 771 n.51 (quoting SCHMIDT, DEMYSTIFYING PAROLE , at 4). Parole and the indeterminate sentence, Professor Friedman explains, were "based on a simple theory." LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 597 (2d ed. 1985).
 

 No judge was wise enough to tell when a prisoner would be "cured." Prison officials, on the other hand, had the prisoner in view every day. A criminal should be locked up as long as he was "unfit to be free." He was the "arbiter of his own fate"; he carried "the key of his prison in his own pocket." The indeterminate sentence, then, emphasized the character and background of the offender.
 

 Id.
 

 But this casts doubt on the dissent's explanation of why procedural protections weren't thought to apply to sentencing and parole proceedings. If those proceedings weren't merely merciful acts of grace, but were, instead, supposed to be responsive to an inmate's prospects for rehabilitation, then it makes little sense for courts to have been unconcerned with the standards that might apply to the ascertainment of those prospects. And today, of course, all parties to a sentencing fully expect reasoned, well thought out Parole Board decisions about when an inmate should be released from prison-not random acts of mercy.
 

 ¶ 88 In short, we are not confident in the dissent's originalist analysis of the scope of the due process provision. We don't mean to say that the dissent is
 
 wrong
 
 , only that, in the absence of adversarial briefing on the question, we don't know the answer. We believe the appropriate course is to stay our
 hand on the question until such time that it's fairly before us.
 

 2. The Original Content of Due Process: What's in a Hearing?
 

 ¶ 89 The dissent also has a second line of attack: one focused on the
 
 content
 
 of the due process provision. That is, assuming the due process provision applies to parole proceedings, the dissent thinks it plain that Mr. Neese received all he was entitled to under the original understanding of the due process provision. According to the dissent, the Utah Constitution embodies a conception of due process on which due process is satisfied as long as an inmate receives "notice and an opportunity to be heard."
 
 Infra
 
 ¶ 169. And the dissent thinks Mr. Neese got this: "[h]e was advised of the pendency of the parole hearing and given a chance to present his view on the questions presented."
 
 Infra
 
 ¶ 170 (citation omitted).
 
 [11]
 

 ¶ 90 But in surveying the history of due process in the run up to ratification, we don't perceive as clearly as the dissent does that constitutional due process protections required only minimal notice and opportunity to speak. Instead, it appears to us that the United States Supreme Court repeatedly explained during the period leading up to Utah's admission to the Union that due process had bite. It required hearings to be conducted according to those procedures that were "appropriate to the nature of the case."
 
 Davidson v. New Orleans
 
 ,
 
 96 U.S. 97
 
 , 105,
 
 24 L.Ed. 616
 
 (1877) ;
 
 see also
 

 Hagar v. Reclamation Dist. No. 108
 
 ,
 
 111 U.S. 701
 
 , 708,
 
 4 S.Ct. 663
 
 ,
 
 28 L.Ed. 569
 
 (1884) ("It is sufficient to observe here that by 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected."). And it held that
 
 the courts
 
 , not the legislature, were supposed to decide what was "appropriate to the case" and "just to the parties."
 
 Hagar
 
 ,
 
 111 U.S. at 707-08
 
 ,
 
 4 S.Ct. 663
 
 . The propriety of procedures, said the Court, was to be ascertained "by the gradual process of
 
 judicial
 
 inclusion and exclusion"-that is, by judicial review of the fairness of procedures when those procedures were challenged in the courts.
 

 Id.
 

 (emphasis added) (quoting
 
 Davidson
 
 ,
 
 96 U.S. at
 
 104 ).
 

 ¶ 91 Applying this framework, the Court didn't hesitate to strike down laws that shortcut fair process. One example is
 
 Chicago, Milwaukee and St. Paul Railway Co. v. Minnesota ex rel. Railroad Warehouse Commission
 
 ,
 
 134 U.S. 418
 
 ,
 
 10 S.Ct. 462
 
 ,
 
 33 L.Ed. 970
 
 (1890). In 1887, the Minnesota legislature-responding to pressures from the Granger Movement (farmers who felt gouged by the railways)-established a "railroad and warehouse commission" empowered to determine whether railroad rates were "unreasonable" or "unequal" and to fix them accordingly.
 

 Id.
 

 at 418, 434-35
 
 ,
 
 10 S.Ct. 462
 
 ;
 
 see
 
 James W. Ely, Jr.,
 
 The Railroad Question Revisited:
 
 Chicago, Milwaukee & St. Paul Railway v. Minnesota
 
 and Constitutional Limits on State Regulations
 
 , 12 GREAT PLAINS Q. 121, 121 (1992) ("Many midwestern and southern state legislatures enacted so-called Granger laws to control the price charged by railroads and related utilities, such as grain elevators and warehouses."). After the Minnesota Supreme Court held that this commission's decisions weren't subject to judicial review, the Supreme Court granted a writ of error and reversed.
 

 Chi., Milwaukee & St. Paul Ry. Co.
 
 ,
 
 134 U.S. at 458-59
 
 ,
 
 10 S.Ct. 462
 
 . This scheme, the Court held, violated due process because "[i]t deprive[d] the company of its right to a judicial investigation, by due process of law, under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy."
 

 Id.
 

 at 457
 
 ,
 
 10 S.Ct. 462
 
 .
 

 No hearing is provided for; no summons or notice to the company before the commission has found what it is to find, and declared what it is to declare;
 
 no opportunity provided for the company to introduce witnesses before the commission
 
 ,-in fact,
 
 nothing which has the semblance of due process of law
 
 ....
 

 Id.
 

 (emphases added).
 

 ¶ 92 State courts behaved similarly. In
 
 State ex rel. Blaisdell v. Billings
 
 , for example, the Minnesota Supreme Court considered whether statutory procedures "relating to the commitment of insane persons to the state hospitals ... violate the fourteenth amendment to the federal constitution, and are in conflict with a similar article in our state constitution, forbidding that any person shall be deprived of his life, liberty, or property without due process of law."
 
 55 Minn. 467
 
 ,
 
 57 N.W. 794
 
 , 794 (1894). Under the statute, whenever a probate judge or court commissioner "receive[d] information in writing ... that there is an insane person in his county needing care and treatment," they were required to deputize two physicians as "examiners in lunacy" to certify whether the person charged with insanity was mentally unsound.
 

 Id.
 

 at 795
 
 . Once "satisfied that the person is insane," the court commission or probate judge had the authority to "commit[ ] him to the custody of the superintendent of" a mental institution.
 

 Id.
 

 ¶ 93 The Minnesota Supreme Court struck this statute down, holding that
 

 [t]o the person charged with being insane to a degree requiring the interposition of the authorities and the restraint provided for, there must be given notice of the proceeding, and also an opportunity to be heard in the tribunal which is to pass judgment upon his right to his personal liberty in the future. There must be a trial before judgment can be pronounced, and there can be no proper trial unless there is guarantied the right to produce witnesses and to submit evidence. ... Any statute having for its object the deprivation of the liberty of a person cannot be upheld unless [these rights are] secured, for the object may be attained in defiance of the constitution, and without due process of law.
 

 Id.
 

 ¶ 94 It appears to us, then, that the dissent's reconstruction emphasizes only
 
 one
 
 due process theme from Gilded Age courts: the need to ensure flexibility in the procedures that new states must adopt, so as not to stifle the rapid industrial and geographic expansion characteristic of that "quick and active age."
 
 Hurtado v. California
 
 ,
 
 110 U.S. 516
 
 , 529,
 
 4 S.Ct. 292
 
 ,
 
 28 L.Ed. 232
 
 (1884). But by myopically focusing on
 
 Hurtado
 
 , a case that foregrounded this theme, and failing to focus on those cases where the Court was more searching in its review of the process before it, the dissent disregards the potential continued vitality of due process protections during the Gilded Age.
 

 C. The Underlying Error in the Dissent's Originalist Approach
 

 ¶ 95 In our view, the dissent's originalist analysis rests on one fundamental error. Before we address that error, we note that we find much to commend in the dissent's approach to originalism. We agree with the dissent that originalist inquiry must focus on ascertaining the "original public meaning" of the constitutional text.
 
 Infra
 
 ¶ 154.
 

 ¶ 96 We also agree that to ascertain the original public meaning of the constitutional text, we must ask what principles a fluent speaker of the framers' English would have understood a particular constitutional provision to embody.
 
 See
 

 infra
 
 ¶ 154 n.33 ("[T]he predominant originalist theory" requires seekers of the original meaning to "interpret[ ] the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment." (quoting John O.
 

 McGinnis & Michael B. Rappaport,
 
 Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction
 
 , 103 NW. U.L. REV. 751, 761 (2009) )).
 
 See generally
 
 Keith E. Whittington,
 
 The New Originalism
 
 , 2 GEO. J.L. & PUB. POL'Y 599 (2004) (discussing evolution of originalism from "original intent" originalism to "original public meaning" originalism). This understanding is the original meaning-or meanings-of the constitutional text.
 

 ¶ 97 We part ways with the dissent's originalist approach not in its end goal-figuring out what a person steeped in Gilded Age linguistic norms would've understood the constitutional language to express-but in the means appropriate to reaching this goal. In our view, the dissent's application of originalism commits a key methodological error-an error that one scholar has recently called "atomistic translation"-translating the meaning of the constitutional text through a process of "term-for-term ... substitution." Jonathan Gienapp,
 
 Historicism and Holism: Failures of Originalist Translation
 
 , 84 FORDHAM L. REV. 935, 941-42 (2015).
 

 ¶ 98 The problem is that to understand what principle a fluent speaker of the framers' English would have understood a particular constitutional provision to embody will often-though surely not always-require more than just examining the terms used and seeking to translate those terms into roughly equivalent contemporary English. What is missing from this approach is deep immersion in the shared linguistic, political, and legal presuppositions and understandings of the ratification era.
 

 ¶ 99 Linguistically, originalism will often require the constitutional interpreter to "access the semantics and pragmatics available to a competent speaker of American English at the time each provision was framed and ratified." Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record 17 (Apr. 26, 2017) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3019494 (The pragmatics will include presuppositions shared by the community of speakers at the time of ratification.);
 
 see also
 
 André LeDuc,
 
 Making the Premises About Constitutional Meaning Express: The New Originalism and Its Critics
 
 , 31 BYU J. PUB. L. 111, 117 (2016) (noting a recent trend within originalism toward "incorporat[ing] pragmatic import as well as semantic meaning" into the concept of original public meaning). But the semantics and pragmatics of the founding era may well be radically different from contemporary linguistic norms and presuppositions.
 
 See
 
 RHYS ISAAC, THE TRANSFORMATION OF VIRGINIA 1740-1790 5 (1999) ("Whether one moves away from oneself in cultural space or in historical time, one does not go far before one is in a world where the taken-for-granted must cease to be so .... Ways must be found of attaining an understanding of the meanings that the inhabitants of other worlds have given to their own everyday customs."). So originalism requires enough engagement with founding-era source materials that we may, without tacitly relying on contemporary linguistic assumptions, see what the operative constitutional phrases connoted.
 

 ¶ 100 Understanding many of the principles embodied in the Utah Constitution will also require fluency in the political and legal presuppositions and understandings of the ratification era. This is because many constitutional principles are just that-general, abstract principles. But this doesn't mean that we may pour our own contemporary moral views into the constitutional text. Instead, we must seek to understand the requirements these principles would have been understood to embody by the founding generation, and we must apply those requirements to contemporary problems. We can't do this without engaging the founding era's political and legal understandings-"trac[ing] intellectual influences ... [and] situat[ing] meaning in the flow of discursive activity"-in order to uncover the "presuppositions and silent logical connectives" that collectively formed the era's understanding of the constitutional text, but that time has hidden from our view.
 
 [12]
 
 Gienapp,
 
 Historicism and Holism
 
 ,
 
 supra
 
 , at 955.
 

 ¶ 101 The fundamental error in the dissent's originalist analysis is that it doesn't immerse itself in Gilded Age sources to uncover and elucidate the principles embodied in the due process provision. It commits this error at both the linguistic and ideological level.
 

 ¶ 102 Linguistically, the dissent relies heavily on Lucius Polk McGehee's treatise to support its claim that "the precise means of notice and an opportunity to be heard are not enshrined in the guarantee of due process."
 
 Infra
 
 ¶ 169. According to the dissent, Professor McGehee tells us that " '[t]he basis of due process' consists of 'orderly proceedings and an opportunity to defend.' "
 
 Infra
 
 ¶ 169 (quoting LUCIUS POLK MCGEHEE, DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION 2 (1906)). And the dissent takes this to mean that due process only requires a litigant to be given notice of "the pendency of [a] hearing and given a chance to present his view on the questions presented."
 
 Infra
 
 ¶ 170.
 

 ¶ 103 At first blush, this is a reasonable construction. To our contemporary mind "orderly proceedings" and "an opportunity to defend" may very well sound like thin concepts. But a broader engagement with the relevant source material suggests to us that, at the time of ratification, these phrases may have connoted more robust restraints on the legislature than the dissent perceives. For example, Professor McGehee was surely aware of the Court's remarks in
 
 Chicago, Milwaukee and St. Paul Railway Co.
 
 , where the Court indicated that due process would sometimes require elaborate procedural protections, including the right to call witnesses. And other courts drew on Professor McGehee's treatise for the proposition that the due process provision constrained the legislature's authority to prescribe rules of evidence and procedure.
 
 See, e.g.
 
 ,
 
 State ex rel. Hurwitz v. North
 
 ,
 
 304 Mo. 607
 
 ,
 
 264 S.W. 678
 
 , 681 (1924) ("The general rule is that the state Legislature has the right to prescribe rules of evidence and rules of procedure. Such rules and laws
 
 must be reasonable
 
 , and give to the party an opportunity to make a defense, for, if they preclude a
 
 full
 
 defense, they would violate due process.") (emphases added) (citing MCGEHEE, DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION 80 (1906)).
 

 ¶ 104 What this suggests to us is that Professor McGehee's phrase-"orderly proceedings and an opportunity to defend"-might well have been understood to mean something different at the time of the Utah Constitution's ratification than it conveys today. Indeed, in
 
 Blaisdell
 
 , the "opportunity to be heard, and to defend" according to an "orderly proceeding adapted to the nature of the case" was thought to include the requirement of "a trial" including "the right to produce witnesses and to submit evidence."
 
 57 N.W. at 795
 
 .
 

 ¶ 105 This isn't to take a definitive stand on the meaning of "orderly proceedings and an opportunity to defend." It's only to illustrate that figuring out its meaning-or meanings-requires deep, sympathetic engagement with a wide array of Gilded Age source material. It's a mistake to interpret those phrases with tacit reference to contemporary linguistic understandings.
 

 ¶ 106 The dissent also fails to adequately immerse itself in relevant political and legal presuppositions and understandings of the Gilded Age. Take, for example, the dissent's analysis of whether the protections of due process might have been understood to apply to sentencing proceedings.
 
 See supra
 
 Part III.B.1 (responding to this portion of the dissent's analysis). The dissent excerpts a set of treatises according to which offenders have "no constitutional right ... to confront witnesses at sentence hearings" and "no recognized constitutional right to present witnesses on their [own] behalf."
 
 Infra
 
 ¶ 171 n.52 (quoting ARTHUR W. CAMPBELL, LAW OF SENTENCING § 13:20 (3d ed. 2004));
 
 see also
 

 infra
 
 ¶ 159 n.37 ("There were no announced standards, procedural or substantive, to control a sentencing judge or jury." (quoting
 Stephen A. Saltzburg,
 
 Due Process, History, and
 
 Apprendi v. New Jersey, 38 AM. CRIM. L. REV. 243, 244 (2001) ).)
 

 ¶ 107 The problem with the dissent's decision to rely on these claims-to the extent they're even accurate,
 
 see supra
 
 Part III.B.1-is that the dissent doesn't consider the degree to which they presuppose or depend on background legal and political assumptions and realities. As we've explained, perhaps there were no "announced standards" applicable to the sentencing phase of a case because there was no meaningful line between the guilt and sentencing phases.
 
 See
 

 supra
 
 ¶¶ 77-78. Or perhaps it was because appellate courts had little opportunity, and even less occasion, to even consider what constitutional protections should apply at sentencing.
 
 [13]
 

 See
 

 supra
 
 ¶¶ 82-83. Or perhaps it was because the nineteenth century took it for granted (1) that sentencing evidence would be sworn and (2) that oaths, by themselves, were sufficiently powerful to assure the reliability of evidence.
 
 See
 

 supra
 
 ¶ 74 n.9.
 

 ¶ 108 If the claims on which the dissent relies turned on any of these background realities or presuppositions, then the dissent is wrong to rely on them. If there were no cases applying due process protections to sentencing because there were no sentencing proceedings, or because few courts had the authority to entertain sentencing appeals, then that tells us little about what due process would've been understood to require in sentencing proceedings had it actually applied. Similarly, if no court applied the due process provision to require confrontation rights or other substantive evidentiary protections only because of the ratification era's general presupposition that sworn testimony was presumptively reliable-backed by the force of a deity-then the demise of this general understanding of the power of the oath suggests that the principle embodied in the due process provision would apply very differently today.
 

 ¶ 109 In sum, only through deep immersion in ratification-era language and debates can an originalist hope to uncover the principles that many constitutional provisions originally embodied. A failure of deep immersion will lead to atomistic originalist analysis, and, in turn, constitutional error. We've illustrated how this error may have infected the dissent. And we urge litigants who undertake originalist argument to engage in this kind of deep reading in future cases before us.
 

 D. The Relationship Between the Dissent's Methodological Mistake and Its Policy Analysis
 

 ¶ 110 This brings us to the relationship between the dissent's originalist analysis and its policy analysis. The relationship between originalism and policy analysis is different from the relationship between policy and other modes of interpretation. When we're not engaged in originalist research, contemporary policy concerns are never far from our mind. They affect our understanding of the plain meaning of the text,
 
 see
 

 Warner v. Goltra
 
 ,
 
 293 U.S. 155
 
 , 158,
 
 55 S.Ct. 46
 
 ,
 
 79 L.Ed. 254
 
 (1934) (statutes must be read "in the light of the mischief to be corrected and the end to be attained");
 
 In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India
 
 ,
 
 385 F.2d 1017
 
 , 1020 (2d Cir. 1967) (statutes "must be interpreted in terms of the mischief [they were] intended to rectify"), and they help determine when we reach for secondary canons of construction and what to do when we reach for them,
 
 Bagley v. Bagley
 
 ,
 
 2016 UT 48
 
 , ¶ 27,
 
 387 P.3d 1000
 
 ("[T]he
 absurd consequences canon ... resolve[s] an ambiguity by choosing the reading that avoids absurd results." (second alteration in original) (citation omitted) (internal quotation marks omitted)). But originalist analysis requires us to discard our own policy views in order to get a full, sympathetic understanding of the policy considerations that animated a generation with radically different practices, understandings, and concerns.
 

 ¶ 111 This is difficult to do. Indeed, there's a long, proud American tradition-dating at least to John Adams-of reading our contemporary policy preferences into ancient texts.
 
 See
 
 BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 24-25 (2d ed. 1992) (noting that in 1774, John Adams "had cited Plato as an advocate of equality and self-government but ... was so shocked when he finally studied the philosopher that he concluded that the
 
 Republic
 
 must have been meant as a satire"). Scholars have even recognized that this makes up part of the deep rhetorical power of originalism.
 

 [T]he deeper power of originalist argument sounds in the romance of national identity. Whether originalist arguments have [rhetorical] purchase depends less on the accuracy of their historical accounts-or the plausibility of their theories of intertemporal authority-than on whether their audiences recognize themselves, or perhaps their idealized selves, in the portrait of American origins that is on offer.
 

 Richard Primus,
 
 The Functions of Ethical Originalism
 
 , 88 TEX. L. REV. SEE ALSO 79, 80 (2010).
 

 ¶ 112 We worry that the dissent has fallen into this trap. The dissent excoriates
 
 Labrum
 
 . The approach
 
 Labrum
 
 employs "undermine[s] the orderly evolution of our law [by] ... constitutionaliz[ing] fields meant for policymakers."
 
 Infra
 
 ¶ 177. It is "fuzzy and unworkable."
 
 Infra
 
 ¶ 185. "[U]nmanageable."
 
 Infra
 
 ¶ 185. It "dashe[s]" the expectations of the good, law-abiding citizens of this state (who presumably sleep easier when inmates who haven't been convicted of sex crimes are hooked up to penile plethysmograph machines based on a parole officer's hunch).
 
 Infra
 
 ¶ 188. It's a one-way ratchet, laying the groundwork "for ever-expanding procedural mechanisms."
 
 Infra
 
 ¶ 184. "[W]hat about the victim ...?"
 
 Infra
 
 ¶ 186. "And what about the general public ...?"
 
 Infra
 
 ¶ 186.
 

 ¶ 113 We, of course, disagree with the dissent's analysis. Our decision isn't a one-way ratchet; it plainly balances administrability with concerns for accuracy in meting out punishment.
 
 See
 

 supra
 
 ¶ 43.
 
 [14]
 
 The public's interest in sex offenders' receiving treatment is leavened by its commitment to ensuring that we reliably distinguish between those who have committed sex crimes and those who haven't-a commitment to the rule of law that is at the very heart of our society.
 
 See
 

 State v. McClellan
 
 ,
 
 2009 UT 50
 
 , ¶ 29,
 
 216 P.3d 956
 
 ("[O]ur constitutional system is primarily designed to protect the innocent, not punish the guilty."). This protects victims too-it protects all of us from the arbitrary hand of law enforcement.
 
 [15]
 

 ¶ 114 More importantly, however, we're troubled by the dissent's willingness to locate its perspective on the law in the past without the benefit of adversarial briefing. The dissent's view-that due process protections may not apply to sentencing and parole, and, even if they do, they don't require any procedural
 protections designed to ensure accurate, non-arbitrary decisions-is discomfiting. For Mr. Neese, it would mean that the Parole Board could rely on untested allegations to force him to choose between (1) being labeled a sex offender, subjected to the increased risk of violence to which sex offenders are exposed, and required to complete a profoundly invasive and degrading program of treatment (one he can't truthfully participate in if, as he maintains, he isn't a sex offender) or (2) being kept in prison for much of the rest of his life. Even the dissent expresses discomfort with this consequence of its conception of due process-a conception that privileges bright lines over fairness.
 
 See
 

 infra
 
 ¶ 120.
 

 ¶ 115 But, as we've explained, the past doesn't unambiguously support the dissent's analysis. The dissent's analysis hasn't been briefed to us. And we're accordingly unable to deprive Mr. Neese of the due process protections to which he is entitled under a faithful application of
 
 Labrum
 
 .
 

 CONCLUSION
 

 ¶ 116 Based on the undisputed facts, we conclude that before the Parole Board considers the unconvicted sexual offense that its hearing officers have questioned Mr. Neese about, article I, section 7 of the Utah Constitution requires it to provide Mr. Neese with the additional procedural protections that this opinion has described. We therefore reverse the district court's order granting summary judgment to the Parole Board in this case and remand for proceedings consistent with this opinion.
 

 Chief Justice Durrant, concurring in part and concurring in the result:
 

 ¶ 117 I concur in sections I, II, and part A of section III of the majority opinion, but write separately to express my disagreement with parts B, C, and D of section III. I share the majority's view that in
 
 Labrum v. Utah State Board of Pardons
 

 [16]
 
 we adopted the proposition that " 'original release hearings'-such as the hearing at issue here-'are analogous to sentencing hearings and require due process to the extent that the analogy holds.' "
 
 [17]
 
 I also agree that, while the due process protections the majority identifies here were not specifically addressed by the
 
 Labrum
 
 court, they are consistent with the core premise of the
 
 Labrum
 
 opinion and are a logical and reasonable extension of that premise. Additionally, I share the majority's view that the dissent's central argument-that "the historical record does not suggest that the nineteenth century understanding of the constitutional right of 'due process' would have extended to sentencing proceedings"
 
 [18]
 
 -is inconsistent with
 
 Labrum
 
 's central holding and that to adopt that argument would be to effectively overrule
 
 Labrum
 
 . Finally, I agree with the majority that because Mr. Neese has not sought to overrule
 
 Labrum
 
 , and because neither party has provided us with adequate briefing on the Utah Constitution's due process clause, it is unnecessary to conduct a historical analysis in this case.
 
 [19]
 

 ¶ 118 But I part paths with the majority's decision to substantively address the dissent's historical analysis. I believe the majority errs in engaging in a debate on the merits as to arguments presented by the dissent, and further errs in putting a thumb on the scale with respect to some of those issues. While the majority refrains from stating "any definite conclusions about this history without the benefit of adversarial briefing,"
 
 [20]
 
 it nevertheless appears to indicate a preferred resolution of some key issues.
 
 [21]
 
 I understand
 the majority's reluctance to let the dissent's arguments go uncontested, but, for the reasons offered by the majority in support of its view that the dissent has unnecessarily and without adequate briefing set forth a historical analysis, I would not engage in a substantive rebuttal of that analysis.
 

 ¶ 119 Determining the correct historical understanding of our state constitution's due process clause is an issue of obvious importance. And it is an issue, as the competing opinions in this case illustrate, fraught with complexity. In my view, this is not the case to engage in substantive debate on this issue, either in the first instance or in rebuttal.
 

 Because this is an appeal from an order granting summary judgment in favor of the Parole Board, we summarize the facts in the light most favorable to Mr. Neese.
 
 See
 

 Borghetti v. Sys. & Comput.Tech., Inc.
 
 ,
 
 2008 UT 77
 
 , ¶ 12,
 
 199 P.3d 907
 
 .
 

 Mr. Neese was tried on these allegations, but the proceeding ended in a mistrial. As far as the record reveals, Mr. Neese has never been convicted of this or any other sex offense.
 

 While the Parole Board concedes the issue of what process Mr. Neese was entitled to "was preserved below," it notes in passing that Mr. Neese's petition for an extraordinary writ in the district court didn't specify the precise due process protections to which Mr. Neese believed he was entitled. This statement, read in context, is a suggestion that Mr. Neese hasn't met his burden of persuasion. But because this issue was inadequately briefed, it's of no consequence. Moreover, Mr. Neese asserted that the Parole Board acted in violation of his due process rights, and he sought reversal of its determinations on that basis. It's enough under the circumstances that he argued that the process he received was insufficient to justify the Parole Board's actions.
 

 We take care to say "at a minimum" because it may be more accurate for us to describe what happened here as a lopsided trial.
 

 The dissent repeatedly claims safe harbor to launch its assault on
 
 Labrum
 
 and to undertake its independent originalist analysis based upon our decision not to seek supplemental briefing. If played out to its logical end, the dissent's argument would allow any justice to write on any argument at any time because the court could have, but didn't, request supplemental briefing. We respectfully reject any such notion.
 

 In response, the dissent makes much of Mr. Neese not citing to
 
 Labrum
 
 in his opening brief.
 
 See
 

 infra
 
 ¶ 129. That is a fair criticism, but one that sidesteps the fact that (1) Mr. Neese did make the underlying state due process argument in his initial brief and (2) the State extensively briefed
 
 Labrum
 
 in response, as did Mr. Neese on reply.
 

 In his opinion concurring in part and dissenting in part, the Chief Justice suggests that in highlighting why we believe the dissent's historical analysis may be incomplete, we have somehow put "a thumb on the scale."
 
 Infra
 
 ¶ 118. That is not our intent and we disavow any language that might suggest otherwise.
 

 What
 
 does
 
 appear to be absent from the reports are any cases in which a sentencing body based its sentence on a determination that the defendant had committed a hitherto unadjudicated, unadmitted criminal offense. This suggests to us that such a basis might well have been thought to run afoul of basic constitutional norms.
 

 Each of these cases is also notable for its insistence-really presupposition-that all evidence before a sentencing court must be sworn.
 
 See
 

 State v. Reeder
 
 ,
 
 79 S.C. 139
 
 ,
 
 60 S.E. 434
 
 , 435 (1908) ("[I]t is the correct practice for [the court] to hear
 
 evidence
 
 in aggravation or mitigation, as the case may be, where there is any discretion as to the punishment." (emphasis added));
 
 Kistler v. State
 
 ,
 
 54 Ind. 400
 
 , 403 (1876) (court must "hear evidence in aggravation or mitigation ... where there is any discretion as to the punishment");
 
 People v. Vermilyea
 
 ,
 
 7 Cow. 108
 
 , 143 (N.Y. Sup. Ct. 1827) (requiring sentencing courts to consider "the circumstances in evidence");
 
 State v. Smith
 
 ,
 
 2 S.C.L. (2 Bay) 62
 
 , 62-63 (S.C. Const. Ct. App. 1796) ("[A]ll such extenuating circumstances should be submitted to the court,
 
 on affidavits
 
 , a reasonable time before sentence is pronounced." (emphasis added)). It's hard to overstate the crucial importance that the eighteenth and nineteenth centuries placed on the power of oaths to assure the reliability of evidence.
 
 See, e.g.
 
 , 1 Simon Greenleaf, a Treatise on the Law of Evidence 377 (Boston, Little & Brown 1842) ("[O]ne of the main provisions of the law, for the purity and truth of oral evidence, is, that it be delivered under the
 
 sanction of an oath
 
 . Men in general are sensible of the motives and restraints of religion, and acknowledge their accountability to that Being, from whom no secrets are hid."); Michael W. McConnell,
 
 The Origins and Historical Understanding of Free Exercise of Religion
 
 ,
 
 103 Harv. L. Rev. 1409
 
 , 1467 (1990) ("The oath requirement was the principal means of ensuring honest testimony and of solemnizing obligations. At a time when perjury prosecutions were unusual, extratemporal sanctions for telling falsehoods or reneging on commitments were thought indispensable to civil society."). By requiring that the evidence be sworn, these courts placed great weight on ensuring the reliability of evidence in sentencing proceedings. At least one nineteenth-century court expressed concern with a statutory scheme for the commitment of the insane in part on the grounds that it authorized an investigation to be commenced based on "the filing of an information not even sworn to by anybody"-an authorization that, in the court's view, "opened the door to wrong and injustice[,] to the making of very serious and unwarranted charges against others by wholly irresponsible and evil-minded persons."
 
 State ex rel. Blaisdell v. Billings
 
 ,
 
 55 Minn. 467
 
 ,
 
 57 N.W. 794
 
 , 795 (1894). But oaths have largely lost their power today.
 
 See
 
 Albert W. Alschuler,
 
 A Peculiar Privilege in Historical Perspective: The Right to Remain Silent
 
 ,
 
 94 Mich. L. Rev. 2625
 
 , 2632 (1996) ("The coercive power of an oath stemmed partly from its mystic and religious significance, a significance that modern observers may not fully appreciate."). And because of this, we should hesitate to infer from the absence of alternative required procedures for assuring the reliability of evidence that the underlying principles of due process in the eighteenth and nineteenth centuries wouldn't have required alternative procedures in those places where the oath had lost its sway.
 
 Cf.
 

 infra
 
 ¶ 153 ("Thoughtful originalists ... view the constitution-like all law-as consisting of
 
 legal principles
 
 expressed by the
 
 public understanding of its terms
 
 . But they do not foreclose
 
 new applications
 
 of those principles to circumstances unknown to the past.").
 

 Kistler v. State
 
 , discussed above at paragraph 74, serves as an example of both the intermingling of the guilt and sentencing phases and jury sentencing in the latter half of the nineteenth century.
 
 54 Ind. 400
 
 .
 

 We perceive some tension between this proposition and the view our dissenting colleague propounded in
 
 In re Adoption of K.A.S
 
 .
 
 See
 

 2016 UT 55
 
 , ¶ 82,
 
 390 P.3d 278
 
 (Lee, A.C.J., dissenting) ("L.E.S.'s history [of the original meaning of the due process provision] falls short because it is at far too high a level of generality."). There, Justice Lee surveyed the historical landscape and concluded that-on the prevalent understanding of due process principles at the time the Utah Constitution was enacted-due process required "regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings."
 
 Id.
 
 ¶ 88 (quoting
 
 Murray v. Hoboken Land & Improvement Co.
 
 , 59 U.S. (18 How.) 272, 280,
 
 15 L.Ed. 372
 
 (1855) ). It required "a right to notice and a meaningful opportunity to be heard."
 
 Id.
 
 ¶ 90 (citation omitted). Here, however, the dissent argues that a litigant's due process right to "trial according to some settled course of judicial proceedings,"
 
 id.
 
 ¶ 88 (citation omitted), his right to "a meaningful opportunity to be heard,"
 
 id.
 
 ¶ 90, requires no more than a "chance to present his view on the questions presented."
 
 Infra
 
 ¶ 170. It doesn't appear to us that the opportunity to speak on one's own behalf is equivalent to a "trial" or a "
 
 meaningful
 
 opportunity to be heard."
 
 In re Adoption of K.A.S.
 
 ,
 
 2016 UT 55
 
 , ¶¶ 88, 90 (Lee, A.C.J., dissenting) (emphasis added).
 

 In this respect we part ways with Professor Solum, who argues that originalist translation doesn't require immersion in the "ideology ... and ideas" of the ratification period, just its "semantics or pragmatics." Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record 19 (Apr. 26, 2017) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3019494.
 

 For example, courts may not have had a need to invoke constitutional principles because their authority over the common law gave them adequate means to articulate procedural protections. For most of the nineteenth century, criminal law and procedure was exclusively judge-made common law. Lawrence M. Friedman, a History of American Law 407 (2d ed. 1985) (noting that the accomplishments of the codification movement were "fairly meager ... up to the end of the 19th century");
 
 see also
 
 Aniceto Masferrer,
 
 The Passionate Discussion Among Common Lawyers About Postbellum American Codification: An Approach to Its Legal Argumentation
 
 ,
 
 40 Ariz. St. L.J. 173
 
 , 177 (2008) (noting that the codification debate took place "[i]n the 1880s and 1890s"). And, common law decisions can be reviewed, and overturned, without invoking constitutional principles. It was therefore only after the success of codification that courts would've felt a need to invoke constitutional principles. But this doesn't mean that those principles wouldn't have been understood to embody many of the common law decisions courts made.
 

 The dissent is concerned that the logic of our decision "provides no stopping point" for new due process protections and will lead to an ever-expanding ambit of procedural requirements.
 
 Infra
 
 ¶ 184. But this decision repeatedly emphasizes that its purpose is to ensure that Parole Board determinations about whether an inmate has committed an unconvicted crime are adequately supported by notice, evidence, and a rationale-concepts that are basic to the system's historic commitment to due process. The dissent's concerns thus appear to be with the entire enterprise of courts' ensuring procedural protections, not with anything distinctive about this case.
 

 We disagree with the dissent's suggestion that we've demonstrated inadequate concern for the victim in this case.
 
 Infra
 
 ¶¶ 186-191. While it's correct that Mr. Neese was "convicted of crimes sustaining a sentence of up to thirty-two years in prison," the victim had no legitimate expectation that such a sentence would be sustained based upon unconvicted crimes.
 
 Infra
 
 ¶ 187. In addition, our opinion today doesn't even bar the Parole Board from taking into account unconvicted crimes, it only requires it to afford Mr. Neese a minimal amount of due process before doing so.
 

 870 P.2d 902
 
 (Utah 1993).
 

 Supra
 
 ¶ 60 (quoting
 
 Labrum
 
 ,
 
 870 P.2d at
 
 908 ).
 

 Infra
 
 ¶ 163 n.45.
 

 I also would not seek further briefing on the question of the historical meaning of the due process clause because it is unnecessary to the resolution of this case.
 

 Supra
 
 ¶ 70.
 

 See, e.g.
 
 ,
 
 supra
 
 ¶ 71 ("Contrary to the dissent, it appears to us that the reports may contain notable examples of cases that applied procedural protections to sentencing proceedings.");
 
 supra
 
 ¶ 72 ("
 
 Williams
 
 , in turn, relied on
 
 State v. Reeder
 
 . It appears to us, however, that
 
 Reeder
 
 and the cases on which it relied may stand for the proposition that sentencing judges must
 
 adhere
 
 to norms of due process when settling on a sentence." (citation omitted));
 
 supra
 
 ¶ 74 ("The other cases on which
 
 Reeder
 
 relied likewise appear to potentially recognize the importance of procedural protections in connection with sentencing.");
 
 supra
 
 ¶ 75 ("So, contrary to the dissent, it appears to us that procedural protections may have been understood to apply to sentencing proceedings in the period leading up to ratification of the Utah Constitution.");
 
 supra
 
 ¶ 78 ("And there's good reason to think due process protections may have applied at sentencing.").